THE BERGEN COUNTY TRACTION COMPANY, PLAINTIFF IN ERROR, v. ALEXANDER T. BLISS, DEFENDANT IN ERROR.

Argued June 30 and July 1, 1898—Decided November 14, 1898.

1. The opinion of an expert witness as to the cause of an accident is incompetent when it is based upon the existence of certain facts and conditions at the time of the accident of which he has no personal

knowledge, and has not heard all the evidence in the case, unless the opinion is elicited by a question entirely hypothetical in form.

2. The opinion of a witness that the kind of block signals used on a trolley road are not such as to insure reasonable safety to the employes operating the cars of that road, is incompetent and irrelevant, that conclusion being a question for the jury alone to determine from all the evidence in the case.

On error to the Supreme Court.

For the plaintiff in error, *Leon Abbett* and *James B. Vredenburgh.*

For the defendant in error, *John I. Weller.*

The opinion of the court was delivered by

NIXON, J.    The writ in this cause brings here the record of a suit in the Supreme Court, tried at the Hudson Circuit, in which the defendant in error recovered judgment against the plaintiff in error for injuries received in a collision of two electric motor cars.

The Bergen County Traction Company operates a single-track electric railroad between Fort Lee Ferry and Englewood, with sidings or turnouts at certain points where cars moving in opposite directions may pass.    These turnouts are designated by numbers, and the accident occurred between No. 1 and No. 2, on the morning of March 3d, 1897, and was occasioned by the failure of one of the colliding cars to remain on the siding until the approaching car passed it.

To prevent delays, as well as accidents, the company was using at the time of this collision the Ramsey block signals. This system of signals consists of boxes placed about five feet high on the poles at the side of the track on which the trolley wires are run.    In the boxes are two apartments, in each of which are lamps, and at the bottom of the box are handles which when properly turned control the lights by making the circuit between the box at one turnout with the box at the next, which two boxes are connected with wires, and these wires are again connected with the feed wires of the trolley

road.   In practical operation, when a car comes to a turnout or siding, it either remains on the siding or goes on according to the signals displayed, a red light meaning to remain and a dark signal or no light indicating a clear track and to go ahead ; and it is also the duty of each conductor in passing a siding to turn the handles and thus set the signals for both the car behind and the one approaching not to enter the same block.

On the morning of the accident the car on which the defendant in error was employed as motorman came to the siding known as No. 1, and found the signal box dark, which indicates a clear track, and proceeding into the next block the collision occurred and consequent injuries which resulted in the suit and judgment now under review.

The alleged negligence of the traction company was of course the foundation of the action, and the averments of the plaintiff's declaration charge neglect in the operation of the road generally and more specifically in the use of a defective system of block signals, and also the negligent supervision and imperfect condition of the wires at the time of the accident by reason of which those operating the cars were misled by false signals.

The assignments of error are seven in number, but with several of them it will not be necessary to deal.   The first need not be considered, for it is fully embraced in the third and they can be disposed of together.   The second is entirely too vague, and upon a careful inspection of the record we fail to find any exceptions signed and sealed which justify its presentation to this court.   The fourth, that the trial judge erred in refusing to grant a motion of nonsuit when the plaintiff rested his case, cannot be sustained.   There was proof at that stage of the trial to show that the signals had misled the plaintiff below to his injury, and evidence had been given as to the possible existence of certain causes which may have led to the derangement of the signals, and whether the conditions actually existed, and if existing, were sufficient to cause the accident, and if they were sufficient, then whether

they were in any way chargeable to the negligence of the traction company, were questions already raised by the evidence which it was clearly the province of the jury to pass upon, and the trial judge did not err in denying the defendant's motion. The fifth assignment, that there was error in refusing to direct a verdict for the defendant, cannot be considered for the same reasons greatly augmented by the additional evidence in direct conflict with that previously given. The sixth, which is an exception to the refusal of the judge to charge as therein requested, can be disposed of by merely stating that while the request undoubtedly contains a correct rule of law, we think it was substantially presented to the jury in the very able and comprehensive charge which forms a part of the record. The court only declined to charge " other than already charged." That the refusal to adopt the language of a request furnishes no ground for an assignment of error when the same legal principle has been given to the jury in another form, has been repeatedly announced by this court. The seventh assignment need not be separately discussed, as it is practically included in the others.

The exception that demands special consideration is the third, which is to the admission in evidence at the trial of two questions and answers which were objected to by the defendant's counsel and the objections overruled.

The witness to whom the questions were put had been summoned as an expert electrician, and after an examination as to his qualifications to testify as such, was admitted by the court in the proper exercise of its discretion. The first of the questions objected to is the following, as it was repeated in response to the court's inqury, " What is the question," to wit, " What, in his experience as an electrician, is his opinion as to how the accident occurred ? " and in this form it was answered by the witness in these words : " My opinion is that there was a ground on the circuit between the two boxes, No. 1 and No. 2, which allowed the lamps to burn, indicating a leakage, that is, it allowed the lamps at one end to be dark while the lamps were lighted at the other end ; for in-

stance, the lamps at the switch at the distant end connect with a trolley, the current flows through them, and lighted them up or darkened the lamps at the distant end because there would be no feed there."

It will be perceived that this opinion is based upon the possible existence of certain conditions—first, there must have been a ground on the circuit between boxes No. 1 and No. 2; and second, that there was a leakage sufficient to make the lamps at one end dark because there was no feed there.  Whether there was in fact such a ground on the circuit when the accident occurred this witness could not know, for he had stated previously that his first visit to the place of the accident for the purpose of examining as to its possible cause was in the month of September, with Mr. Weller, counsel for the plaintiff.  The clearest definition to be found in this record as to what a ground really is may be found in another part of the evidence of this witness, and we quote it here merely for the purpose of elucidation :

"*Q.* You think that this accident might have occurred from the wire being grounded—what do you mean by the wire being grounded ?

"*A.* I mean by ground that in and between your east and west box there was a ground in the wire that carried the current between those two boxes.

"*Q.* You mean the wire that was between turnout No. 1 and No. 2 that it escaped and was carried to the ground ?

"*A.* The current went to the ground.

"*Q.* How did it come to the ground ?

"*A.* It would go through the branch of a wet tree."

This witness stated that upon the occasion of his visit to the place of the accident with Mr. Weller that a tree touched these wires, and is asked :

"*Q.* Did you call anyone's attention to them ?

"*A.* I called Mr. Weller's attention to it ; he said, 'What about these trees—here are the wires touching trees ?' and I told him that if the covering was worn off the wire and the trees became damp it would cause the wire to be grounded."

Witness had previously been asked the question:

"*Q.* When were you with Mr. Weller?

"*A.* I think some time in September."

In the answer to the question objected to and now under consideration the witness gave his unqualified opinion to the jury that there was a ground, thus determining in his own mind the existence of certain facts and conditions which had not been either proved or admitted, and drawing a conclusion which the jury alone should draw from all the evidence in the case at the close of the trial. The question asked witness was not based on any hypothesis, and the categorical opinion of this witness assumed as true not only contact between the tree and wires but also a sufficient chafing to destroy the insulation of the wire and also a damp surface and sufficient leakage to derange the signals. Much of the evidence of this witness was scientific and valuable and calculated to greatly aid the jury and the court in a correct understanding of the construction and operation of the electrical appliances used in the signal system of this trolley road, and under what circumstances a ground might be made, but with the statement of these scientific facts his evidence should have ended. His opinion as elicited by the question was both incompetent and irrelevant and should have been excluded from the jury.

We do not overlook the fact that in many cases the opinion of an expert may be admitted as competent evidence. Mechanics may give an opinion as to the quality of the workmanship on a building or other structure, or a chemist as to the existence of poison, and opinions may be given in matters of handwriting, the value of precious stones, the worth of animals, &c., but in all such cases the opinions are based on the results of ocular demonstration or personal inspection of the thing or subject about which their opinions may be asked, and do not in any way depend upon conditions which may or may not exist and as to the existence of which only the jury must determine. So if the witness in this case had visited the scene of the accident immediately after it occurred, instead of six months afterward when the conditions as to the trees

after a season's growth might have been very different from what they were in March, and had personally inspected the wires and found them chafing against trees and with their insulation thus destroyed or worn off sufficient to cause a ground that would interfere with the signals, then there would have been some warrant for the admission of this opinion.

The other question included in the third assignment of error to which defendant's counsel objected, but which was allowed, is the following:

"*Q.* As such electrician, familiar with the workings of these signals, in your opinion, are the signals such as insure reasonable safeguards to the employes engaged in running and managing cars along that road?

"*A.* No, sir."

This was a question which touched the very heart of the case, and was asked immediately after the one just considered. One of the principal allegations of the plaintiff's declaration was that the defendant company "used and employed unsound, unsafe and defective machinery and other appliances for the purpose of indicating whether cars should pass such turnouts or switches or await a car approaching in an opposite direction," and to determine this contention was one of the chief purposes for which the jury was impaneled. The question was asked at an early stage of the case, when but little evidence on this point had been presented, and the witness may have formed his opinion from facts not known to the jury in any way. In answer to subsequent questions, this witness stated what he deemed to be some of the defects of the system and suggested what he thought would be improvements, which was, of course, competent, while, on the other hand, the evidence afterward produced by the defendant showed that it is a signal system used on about a hundred electric roads in this country and generally regarded a sufficient protection to those operating cars on roads similar to this one. To draw a conclusion from all this evidence was the jury's prerogative, and the opinion of this witness in

reply to the question asked was both irrelevant and incompetent. That this question was allowed is due to the persistence of counsel, who was warned by the learned judge in the following words: "While I think it is a question which rightfully belongs to the jury, although if you insist upon it, I will allow it and overrule the objection," which remark led to an immaterial alteration of the original question to the form in which it was put and answered.

It will be readily perceived how injuriously the admission of the two questions and answers we have been considering, which relate both to the signal system itself and to its proper supervision, may have injuriously affected the defendant company. It is not easy for the average juryman to draw the line between scientific testimony and the mere opinion of an expert witness, and we think our courts should guard well the distinction.

Our conclusion is that the judgment of the Supreme Court should be reversed and a *venire de novo* issued.

*For affirmance*—None.

*For reversal*—The Chancellor, Collins, Depue, Dixon, Garrison, Ludlow, Van Syckel, Adams, Bogert, Hendrickson, Nixon, Vredenburgh. 12.