McCLELLAND et al. v. GREAT SOUTHERN LIFE INS. CO.

No. 4594.

Court of Civil Appeals of Texas. Beaumont.
April 7, 1949.

Rehearing Denied May 18, 1949.

516

Jeff Cochran, Cleveland, James E. Faulkner, Coldspring, for appellants.

Vinson, Elkins, Weems & Francis, of Houston, for appellee.

R. L. MURRAY, Justice.

This is a suit upon a life insurance policy in the principal sum of $10,000, issued by appellee Great Southern Life Insurance Company upon the life of Arzo Oliver Mull, a resident of Cleveland, Liberty County, Texas. Suit was brought in the district court of Liberty County by the appellants, Bidwell C. McClelland, et al, who were beneficiaries in the policy. The appellees and Mr. Mull, the deceased, were partners in the local business known as Home Building Supply Company. They sued for the principal sum of the policy, $10,000, plus 12 per cent statutory penalty and attorney's fees of $3,800, making a total amount of $15,000 sought. The appellee by its pleadings in answer to the suit admitted the issuance and delivery of the policy, payment of premiums, the designation of the appellants as beneficiaries, the death of the insured on December 4, 1947, within two years after the issuance and delivery of the policy, and further pleaded that clause of the policy called "the suicide clause", which read as follows:

"In case of the death of the insured by his own hand while sane or insane within two years from the date of the policy, the company's liability shall be limited to the amount of the premiums paid hereon." Appellee also pleaded that "the death of the insured resulted by his own hand and that his death was occasioned by his own hand". The appellee pleaded tender of the amount of the premiums paid, and the refusal of appellants to accept such tender, and made further tender in its pleadings of such amounts.

The case was tried to a jury and at the conclusion of the evidence, the trial court, on motion of appellee, withdrew the case from the jury and rendered judgment in favor of appellee, except as to the admitted liability of appellee for the amount of the premiums paid, for which judgment was rendered for appellants. Appellants have duly perfected their appeal to this court for review of the judgment.

A large amount of testimony was heard upon the trial. The appellants, plaintiffs in the trial court, proved the issuance and delivery of the policy of insurance, the fact that the deceased was dead, that demand was made by the appellants as beneficiaries for payment by appellee and that payment was refused. They made proof as to what was a reasonable attorney's fee in the premises, and proved that the deceased in his life time had been successful in business, had a happy home life with his wife and two daughters and had been active in civic, business, social and church life of his community. They made further proof to the effect that he was a person of even temperament and friendly disposition, who had never been heard by any of the witnesses testifying in behalf of appellants to express any intention of taking his own life.

The evidence adduced on trial by the appellee was voluminous and detailed as to the manner in which the deceased came to his death at Galveston, Texas, December 4, 1947. From it the following testimony is summarized:

Mrs. Nannie Laura Mull, the widow of Arzo Oliver Mull, the deceased insured, and the mother of his two daughters, ages 10 and 12, testified that her husband died in Galveston, Texas, December 4, 1947; that on Monday evening, October 4, 1948, she testified by deposition in Cleveland, Texas, that Mr. Pete Davis of the First National Bank had in his possession a letter that her husband wrote to her before his death and that the next day after giving her deposition she obtained the letter from Mr. Davis and burned it; that her sister, Mrs. Dollie Davis, read the letter aloud in the presence of Brother Bass (her pastor), Mr. Brady, her father, and Mr. Mull's sister, Mrs. Ruby K. Martin; that she heard the letter read and saw the first line of the letter; that the letter was in the handwriting of her husband; and in the first line that she saw her husband said that "by the time she got the letter he would be no more"; that the rest of the letter which she heard read was personal to her and the children, what she should do with the children and the way she should handle his affairs.

Mrs. Dolly Grady Davis, a sister of Mrs. Nannie Laura Mull, testified that she had known her brother-in-law A. O. Mull 18 years and knew his handwriting; that she

read a letter in his handwriting to his wife Mrs. A. O. Mull, written from Galveston, Texas, on December 4, 1947; that she read the letter in her home in the presence of Mrs. Mull, her father, Mr. Grady, and their minister, Brother Bass, and Mr. Mull's sister Mrs. Martin; that her sister, Mrs. Mull, was sitting next to her on the divan while she was reading the letter and that she correctly read the letter, just as it was written; that in the letter he stated "when you receive this letter I will be no more", and that he also stated in the letter that he wanted his wife to return a few books that belonged to Mr. Scott and some books that belonged to Mr. Alvin Davis; that the letter was dated December 4, 1947, postmarked Galveston, Texas, and addressed to Mrs. Nancy Mull and the salutation was "Dear Nancy and Girls"; that she didn't get the letter out of the post office and didn't remember who handed the letter to her.

Mrs. Mull, by oral deposition taken on October 4, 1948, testified that her husband went to Galveston on December 3, 1947, accompanied by Brother Bass to take the shock treatment; that they left Cleveland about noon in Brother Bass' car and had planned to be gone a couple of weeks; that she and Brother Bass had previously gone to Galveston and talked to Dr. McMillan and he said that by talking to Mr. Mull he would understand his case better and asked that he come down; this was about a week before December 1st; that Mr. Mull was always saying he didn't feel good and he had tried all the medical doctors and Brother Bass suggested that they go talk to Dr. McMillan.

Pete Davis with the First National Bank of Cleveland, Texas testified that he knew Mrs. A. O. Mull, her father Mr. Grady, her sister, Mrs. Dollie Davis and Preacher Bass; that on the day of the funeral of A. O. Mull in Cleveland, Texas Preacher Bass gave him a letter addressed to Mrs. A. O. Mull for safe-keeping and that Mrs. Mull came to the bank and got the letter about a week before the trial of the case and before the subpœna was served upon him to bring the letter to Court; that he didn't read the letter but put it in a long brown envelope and put Scotch tape on it; that the letter was posted Galveston, December

4, 1947; that he and Mull had been business and social friends for approximately 15 years and they belonged to the same church; that Mull was a regular attendant and was superintendent of the Sunday School for several years, a Director of the Boy Scouts and a member of the Lion's Club; that Mull was around 40 or 45; that he was very affable in his business and social life and seemed to enjoy his family life; that he didn't notice any change to amount to anything in Mr. Mull's nervous or social condition as he was not real close to him; but Mull did tell him about being in bad health and having his teeth pulled.

James Marlin Grady, the father of Mrs. Nannie Laura Mull and the father-in-law of the deceased A. O. Mull, testified that the Mulls had been married 12 or 14 years; that he noticed a change in Mr. Mull's general condition shortly before his death; that he made three or four trips to Houston to see Dr. Ghent Graves; that he began losing weight and lost from 150 pounds to about 121 when he died; that he first observed this change in October before his death in December, 1947; that outwardly he didn't appear to be nervous; that he did not appear to be emotionally upset but appeared to be calm; that he had all of his teeth pulled out around May or June before his death in December; that he was present when a letter that Mull had written to his wife before his death was read; that the letter was written the day of Mull's death and he got it out of the mail and that he turned it over to Mrs. Mull after he had read it and that his other daughter, Dollie Davis, read the letter aloud to all present, and then turned it over to Mrs. Mull; that the substance of the letter was "When you get this letter, I will be no more"; that the letter was written in Mull's own handwriting and signed by him; that the letter gave no reason for his contemplated act; that when his daughter married Mull he was a telegraph operator and was connected with Mrs. Austin's Bank in Cleveland as cashier for four or five years; that he was a partner with Theo Scott and Bidwell C. McClelland, Jr., in the Home Building Supply Company and did bookkeeping for several other firms; that he had two children and was active in church and civic work, be-

longing to the Lion's Club, Head of the Boy Scouts, a member of the Volunteer Fire Department and superintendent of the Sunday School, was a good mixer, pretty friendly, cheerful, good-natured and his home life splendid; that Reverend Bass accompanied Mull to Galveston to be put in the hospital just before his death and he gave Reverend Bass a check for $100.00 to pay his entrance fee in the hospital.

Dr. Tom McMillan testified by written deposition that he was licensed to practice medicine in 1940, graduating from the medical branch of the University of Texas and interned at San Diego County General Hospital, San Diego, California, and for six years had specialized in neurology and psychiatry, which includes the examination and treatment of diseases and injuries of the brain and the nervous system, as well as disorders of the personality; that he was assistant psychiatrist for John Sealy Hospital in Galveston and psychiatric consultant at St. Mary's Infirmary in Galveston; that he knew Arzo Oliver Mull during his lifetime and first had an occasion to attend him professionally and examine him on November 20, 1947, which included both subjective and objective symptoms; that at the time of his original examination he found him "to be rather apathetic and retarded. The mood was fixed in a depressed state and remained so throughout the course of the examination. Subjectively the patient complained of nervousness, restlessness, sleeplessness and feelings of insecurity; the physical examination revealed no abnormalities, the blood pressure was 110/70 and the neurological examination was essentially normal and the psychiatric examination indicated that the mood of the patient was fixed in a depressed state; that based upon his examination he was able to make a diagnosis which was—"affective disorders, depressed state", that he prescribed electro-shock treatments because he was of the opinion that Mull was suffering from a severe emotional disorder that would respond favorably to such treatments and that from his original examination both objectively and subjectively he was led to believe that the patient had experienced suicidal thoughts during the course of his illness, but at the time of the examination he was not considered a suicide; that Mr. Mull had told him that he had experienced feelings of futility recently and was afraid of losing his mind and had discarded his pistol so that he would not have that as a source of harm to him and stated he had confessed to his minister that he was afraid he was going to commit suicide; that he assisted in securing a room for Mr. Mull in the Galveston State Hospital in order that he could undergo a program of electro-shock therapy and hospitalization and that he was not placed under restraint in the hospital; that all patients suffering from emotional and nervous diseases are not potential suicides, but only the depressed cases are potentially suicidal and that Mull was suffering from a definite emotional illness of the depressed type; that a person in such condition would be reasonably expected to have suicidal thoughts; that from his examination of Arzo Oliver Mull both objectively and subjectively it was his opinion that he had sufficient mental capacity to know and appreciate acts performed by him and based upon a hypothetical question covering the evidence viewed from the appellee's standpoint, Dr. McMillan gave the professional opinion that Mr. Mull was conscious of the fact that death could be produced by severing the large blood vessel in the neck.

Miss Elsie L. Powell testified that she operated the Powell Hotel in Galveston on December 4, 1947, and was resident manager and was on duty that evening and registered Mr. Mull from Cleveland, Texas, as a guest and brought his registration card to court and it was introduced as evidence in connection with her testimony; that the date written on the card "December 4, 1947" was written by Mr. Mull and he signed it and that Mr. Mull wrote "phone 149" and wrote his address, "Cleveland, Texas" on the registration card; that she wrote on the registration card "Room 306", the room assigned to Mr. Mull as well as the rate of the room "$2.50 day"; that she also wrote on the card "6:00 o'clock" and scratched out the printed "A.M." and left the printed "P.M." and then she initialed the registration card with her initials "E.P."; that Mr. Mull paid the $2.50 in advance and she gave

him a key to the room; that when he came in he asked for a single room and when she told him she had a double room with twin beds which she would make a single rate on and before he registered he asked to see the room and she gave him the key and directed him to the room and later came back and said he would take the room and registered in; that he appeared to be neat, was without baggage, didn't appear to be drinking and seemed to be rational and normal and talked sensibly; that he was alone when he came to the hotel and when he went to look at the room he went by himself and came back by himself and after he had registered in and left to go to his room he went alone; that she didn't see him jump through the window, but later learned he had gone through the window and later saw his body in front of the hotel on a stretcher; that she didn't recall anyone calling for him or asking for him, or coming to see him after he had registered in; that she first learned from Mr. Palmer, a guest in 309 between eight and nine o'clock that there was a fire on the third floor and that she had better call the Fire Department and while she was calling the Fire Department, that Mr. Palmer came back and suggested she had better call the Police Department as there might be trouble up there; that the room she assigned to Mr. Mull had twin beds to the left of the door, a dresser to the right of the door, and that the window through which Mull went was directly in front of the door across the room; that there were three windows in the room and she noticed that the screen was torn from the window that was by the wash basin at the foot of one of the beds; that the bottom of the screen was torn from the window; that the wash basin was on the same side of the room as the dresser, in the corner; that there was a shed or porch on the second floor below the window in room 306, which went all around the building on the street side and that it is one story down from Room 306 to the shed; that she went into the room after Mull had gone through the window and noticed the bed was covered with blood and noticed blood on the dresser and saw a razor blade on the dresser, but didn't

notice if it had blood on it; that when Mr. Mull wrote his address and telephone number on the registration card he specially called her attention to it and said "that is my telephone number—just in—it is the telephone number of my home"; that Mr. J. J. Thomas was the night clerk at the time and she saw him shortly after Mr. Mull went through the window; that he had no blood on him, his clothes were not ruffled up and he didn't appear to have been in a scuffle of any kind; that she had never seen Mull before this time.

W. R. Palmer, a guest in Room 309 of the Powell Hotel on December 4, 1947, testified that he smelled smoke and on investigation found it coming from Room 306 and he called the night clerk, Mr. Thomas, who came up immediately, unlocked room 306 with the passkey and entered and he was right behind Thomas; that the room was full of smoke and he stooped down and saw a lot of blood on the bed nearest the door and he backed out and stooped down and noticed the bed in the northeast corner of the room on fire; that he reported to Miss Powell and suggested that she call the Police and Fire Departments as there was a little fire and there might be some other trouble; that he then went back to the door and "saw a man on his feet walking between the two beds; "I thought he was coming out the door, but he didn't"; that this man was later found on the roof of the building; that the man he saw walking between the beds was going south; that he saw the night clerk go in and out of the room a time or two and one time he had a pitcher in his hand full of water; that after they said the man had jumped out the window he went down stairs and he and Mr. Bennett of the Fire Department went into Room 206 directly under Room 306 and he saw the man from the window and the man was bloody all over; that after that he saw Mr. Thomas and that there wasn't any blood on his clothes nor were they ruffled nor was his hair or anything about him to indicate there had been a struggle.

Joseph J. Thomas, night clerk on duty at the Powell Hotel in Galveston on December 4, 1947, testified that he relieved Miss Powell at the desk that evening; that

his duties were to check all rooms, check folios and register people in at the hotel; that about 8:30 on the evening of December 4, 1947, he had a report that there was a fire in one of the rooms and that he immediately picked up his passkey and went to Room 306; that the door to the room was locked and he opened it with the passkey and entered the room and discovered a fire on the far bed; that the room was entirely dark when he unlocked the door and he turned on the light switch; that the door opened to the right on the inside and the bed that was on fire was to the left, as well as another twin bed in the room; that the beds were on opposite sides of the room and there were two windows on the east side and one window on the north side; the east side being the one towards 25th Street; that there was a little writing desk between the two beds and a chair and a space of four or five feet between the beds; that on the right hand side as you enter the door there was a chest of drawers and beside the chest of drawers was a wash basin and a little stand for holding a pitcher of water; that there was a mirror above the chest of drawers; that as the door was opened he was looking east towards 25th Street; that the beds in the room were arranged north and south, one on the east side and one on the west side; that the dresser and wash basin and clothes closets were on the south side of the room; that the bed he discovered on fire was close to the window; that after he unlocked the door and turned on the lights he noticed that all the windows were closed and that he opened the window on the east side towards the south; that after he unlocked the door, turned on the light and opened the window, he noticed that there was no one in the room except Mull and himself and Mull was lying on the bed with his feet hanging over the foot of the bed; that he attempted to arouse Mull and couldn't and then he pulled fire out from underneath him and tramped it out on the floor; that he then picked up the pitcher from the floor to get water from the basin to pour on the mattress which was still ablaze and that at the time he was getting the water, Mull must have jumped out the window; that later he saw Mull on the roof below the window, one floor down; that when he opened the window, the screen on the window was stationary and in order; that from the time he unlocked the door, until the time the man got out of the room, there was nobody else in the room except him and Mull; that after he had put the fire out he noticed the bed on the west side of the room was a solid sheet of blood; blood on the walls, on the wash stand, mirror and basin; that Mull's hat, billfold and a razor blade were on the dresser; that the razor blade was bare at one corner and he gave the billfold to the detective; that he remained on duty after he relieved Miss Powell that evening until 8 o'clock next morning and a part of his duties were to answer incoming calls to guests as well as outgoing calls from guests; that during the time he was on duty up until the time he found Mull in Room 306 nobody came to the desk and asked for him and he did not receive any telephone calls and did not make any telephone calls; that he did not know Mull and had never seen him before that night; that the plat of the Room "Exhibit B" correctly reflects the room, the furnishings and the correct location of the furnishings therein on the night of December 4, 1947 (this plat is shown on page 292 of the Record); that from where the man's feet were hanging off the bed, you could put your hand from the bed to the window, and if he had gotten up straight in bed, he would have had to turn to go to the window; that when he last saw the man he was on the bed and he then turned to get some water and when he turned around with the pitcher of water, the man had gone out the window; that when he took the passkey and went to Room 306 to investigate the fire he saw another guest, Mr. Palmer there; that it was one floor from the window that he opened down to the roof and there was no ladder leading from the roof to that window.

D. W. Bennett of the Fire Department, testified that he was on duty when a fire call came from the Powell Hotel on the evening of December 4, 1947, and he re-

sponded immediately to the call; that when he arrived at the Powell Hotel Mr. Palmer told him a man jumped out of the window and he went to the second story, went through a window on the second floor, jumped out of the window and saw the man lying on the roof; that he stooped down over the man and saw he was breathing and he obtained a blanket and put on the man; that the ambulance came and he put the man on his shoulder and carried him down; that when he first saw the man he was lying flat on his back with his feet towards the wall and his head towards the street; that is, his head was away from the window and his feet towards the window; that he noticed a cut on the man's neck below his jaw, a couple of inches below the jaw or maybe a little more on the left side and there was blood spewing out pretty good from this cut; that after he took the man from the roof he went to Room 306 to make an investigation and found Detectives Burns, Whitburn and Reifel in the room and he saw Capt. Whitburn pick up a razor blade off the dresser and give it to Detective Burns; that the wrapper was torn about half way off the blade where a man could keep his finger prints or anything else off the blade; that it was a double edged blade and looked like a Gillette and had blood on it; that one bed was pretty bloody and the mattress on the other bed had already been taken out; that he noticed one of the screens at one of the windows was torn; that the man was dressed in his shorts and undershirt; that he saw a bloodsoaked towel on the bed that was bloody and plenty of blood on the floor.

Mrs. R. A. Rucker, who operated Spike's Coffee Shop in connection with the Powell Hotel, gave the following testimony:

"Q. On or about December 4, 1947, did you see a man jump from the window of the third floor of the hotel? A. I did.

"Q. Where did he land? A. I don't know whether he jumped or what happened. I was standing out in the middle of the street. It was a dark object. I couldn't say for sure that it was a man. It looked more like a big pillow or a ball.

"Q. You saw the object come through a window from the third floor? A. Yes, sir.

"Q. Where did this object land? A. He landed on the shed or porch that extends out in front of the hotel.

"Q. Did you have a view of the window from where you were? A. Yes, sir.

"Q. What time of the day or night was it, approximately? A. It was at night late in the afternoon. It was between 8 and 9 o'clock.

"Q. Between 8 and 9 o'clock? A. Yes, sir.

"Q. Did you later learn what it was that you saw going through the window? A. Yes, I was standing there watching when the firemen came and took his body down.

"Q. You saw them take a man's body down? A. Yes.

"Q. Were the lights on in the room? A. Yes, Sir.

"Q. Did you see anybody standing at or near the window or in the room before you saw this man go through the window? A. No, sir.

"Q. Did you see anybody at or near the window immediately after he went through the window? A. No. I don't even think I paid much attention after he jumped out of the window. There was a man that heard the commotion. He hit the screen so hard a man, Mr. McCabe, over at the Santa Fe heard it. He made such a commotion and hit the screen so hard that this fellow at the Santa Fe heard it.

"Q. You can't tell what somebody told you. A. He asked what the commotion was.

"Q. Well, you heard the noise of his hitting the window? A. Yes, Sir.

"Q. I believe that is all."

W. J. Whitburn, Galveston City Detective, testified that he got a call to go to the Powell Hotel about 9:10 P.M. to make an investigation of an accident; that when he and his partner arrived at the hotel, the Fire Department was there and were putting a ladder outside the shed

awning; that he and his partner Reifel went to Room 306 and upon arriving in Room 306 they discovered a lot of people standing around, some smoke in the room, blood all over the floor, on the dresser and on the beds and a blood-soaked towel lying on one of the beds and one of the beds had been set afire; that there was a screen in the window facing the east part of the building which was torn loose along the bottom edge and up both sides about a foot on each side; that when they looked out the window and saw a man on the shed in his undershirt nad underdrawers with his head facing east and his feet facing west, lying on his back; that is, his head was facing away from the building towards the street and there was a lot of blood on the man and on the shed; that the blood was running from the left side of his neck; that Fireman Bennett picked the man up, put him on his shoulder and carried him down the fire ladder; that in their investigation they were handed a double edged razor blade, which looked like a Gillette; that the blade was new and had been partly taken from a little wrapper around one end of it, and it was all bloody and there were fingerprints on the wrapper where somebody held it in his hand; that this razor blade was picked up off the dresser; that Mr. Thomas handed him Mr. Mull's wallet which had a couple of dollars in it; Mull's watch was in the room and there was a letter on the dresser which letter was given to his sister; that this letter had something to do with some Boy Scout business and there was something about some kind of a shortage and he said there must have been some mistake as he had made that up; that about thirty minutes later he and his partner went to the hospital and viewed the body of Mr. Mull; that he had a small cut about two inches below the ear on the left side of his neck that it was kind of slanting a little crosswise, a kind of bilateral cut just about where the jugular vein is and the blood had come out of his neck profusely; that they got in touch with Mr. McKenna, the coroner, who directed Dr. Scofield to perform an autopsy; that he saw Mr. Thomas, the night clerk, in connection with his investigation, and that in his investigation and official duties as an officer he had seen lots of men who had just been through a fight or struggle and that Mr. Thomas did not appear to have been in a recent struggle or fight.

Robert L. Powell, the brother of Miss Elsie Powell, testified that he and his sister had operated the Powell Hotel since 1939, but that he was not at the hotel on the evening of December 4; that his sister called him at the Cavalier Hotel and he immediately went to the hotel and to Room 306; that when he arrived in Room 306 he discovered the floor and dresser covered with blood, all in one streak, starting at the edge of the dresser and running all the way back to the mirror; there was one twin bed just inside the door and another twin bed over by the window and a part of the clothing had been taken off of the bed by the door; that the mattress on the bed next to the window was also saturated with blood and the screen from the lower part of the window was pulled out; that the foot of the bed next to the window was directly facing the wash basin and the foot of the bed was just about the height of the window; that the dresser was directly in front of the twin bed next to the window; that the razor blade had been removed before he arrived; that there was a glass top on the dresser and it looked like a stream of blood starting at the end and going over to the mirror; that he saw Mr. J. J. Thomas, the night clerk, immediately after he arrived; that Mr. Thomas was not bloody; that he did not have any bruises or abrasions on him; that he had on a white shirt and his clothes were not ruffled up and there was nothing to indicate he had been in a recent struggle.

Charles L. Foster, another guest at the Powell Hotel, testified that he had heard some fellow give the fire alarm and he went to Room 306 and he and Mr. Pilcher carried the bed out to the bathroom to put out the fire; that he got blood on his feet on entering the room; that this occurred about 9:00 P.M., that the lights in Room 3 were on when he got up there.

Dr. N. D. Scofield of Galveston, Texas, who qualified as a licensed physician and pathologist at St. Mary's Infirmary of Gal-

veston, testified that he performed a post-mortem examination on Arzo Oliver Mull of Cleveland, Texas, on December 5, 1947, on the authority of James L. McKenna, Justice of the Peace of Precinct No. 1, Galveston County, Texas, to ascertain the primary cause of death that he made a complete post-mortem including the cranial cavity as well as the rest of the body; that the physical findings showed hematome of the scalp in the right occipito parietal area, a bilateral laceration of his neck with severance of the right superior thyroid artery, head contusions, abrasions of the forehead, the face, shoulder and right elbow; that the probable cause of his death was a compound fracture of the third rib on the right with a perforation of the heart causing hemorrhage and that the cause of death was heart injury, resulting from fracture of the rib caused by the fall; that the fractured rib poked a hole in his heart, lacerating his heart and causing him to bleed to death; that the bilaceration of the neck with the severance of the right superior thyroid artery traveled inward and downward the length of about two inches and the depth varied from just through the skin down to about three-quarters of an inch and probably a half inch wide; that such laceration would be reasonably calculated to produce death slowly because he would bleed from it; there would be a continued hemorrhage; that the laceration on the neck was made by a sharp-edged instrument and that it would be very possible for a safety razor edge to make such laceration; that the physical injuries he found on the deceased, other than the laceration of the neck were of such a nature as could have been reasonably caused from the jump from a third story window and landing on a roof projecting from the second floor above and over the sidewalk; that the going through of an open window and a fall of a reasonable distance could have produced the fractured rib and lineal skull fracture.

Tom Collins, a witness for appellants, testified he had known Mull about four years; that he was closely associated with Mull the last few weeks of his life and had dealings with him while he was with the Farmers State Bank in Cleveland, Texas; that he and Mr. Scott were figuring on a partnership with Mull in Dayton, Texas, a short time before his death and he had also been associated with Mull in Boy Scout work; that Mull seemed enthusiastic and interested in the proposed lumber yard in Dayton; that Mr. Mull was active and interested in Boy Scout work and he had attended meetings of the Lion's Club and Rotary Club with Mull and he never noticed him being depressed and he seemed to be a friendly person.

Bidwell C. McClelland, Jr., one of the appellants, testified to his close association with the deceased continuously for eight years and testified that he was active, interested and enthuiastic in church, business and civic affairs and that his family relations were good; that he was jovial and never appeared to be depressed, was cheerful and optimistic toward life.

O. L. Witherspoon, a witness for appellants, testified that he was president of the Farmers State Bank of Cleveland, Texas, and that the deceased had been cashier of the bank six or seven years; that he, in addition to his duties, at the bank, prepared income tax returns and kept Mr. Scott's books; that he made an excellent employee and met the public amicably and cheerfully; was not short in his accounts at the bank; that he was active in Boy Scout work, Lion's Club and church work; that he knew of no reason why Mr. Mull would take his life; that in July, 1947, he gave deceased a two weeks vacation because he noticed a change in his emotional and nervous condition; that after he returned from his vacation he did better for awhile, then he didn't; that his condition appeared to become worse and he got sick again and he went to a doctor in Houston; that again in October, 1947, he gave him an additional two weeks vacation to recuperate because he was sick; that the last ten days of November when he returned from his October vacation, he worked regularly; that his father died in October, 1947, and two other immediate members of his family died about the same time, and these deaths seemed to probably upset him; that he learned that deceased had gone to Galveston to be treated because

of an emotional condition and illness; that Mull was a man who worked too hard.

Jack McKellar, a witness for appellants, testified he had worked in the Farmers State Bank with deceased; that he was an efficient worker, friendly and amicable and never did state to him a desire to take his own life; that in addition to Mr. Mull's duties at the bank, he kept outside books for Mr. Scott, the Cleveland Ice Company and Mr. Ragsdale's Little Lumber Yard; that he was cheerful and cordial towards his wife and children.

Appellants offered the testimony of G. H. Pilcher by deposition, who testified that he was occupying Room 207 at the Powell Hotel on December 4, 1947; that he learned of a fire in Room 306 through Mr. Palmer's attempting to contact Miss Powell or Mr. Powell and that he went up to Room 306 and saw a room full of smoke and a mattress on fire, which he and Charles Foster carried out; that the mattress on fire was on the bed next to the window; he did not notice anyone else in the room; that the man that was later found on the porch wasn't in the room when he went there; that he noticed the other bed in the room was blood-soaked; that there was blood all over the room and he saw the Fire Department move the body from the roof; that the man was lying directly outside the window, his head was facing towards the building and his feet facing 25th Street; that there was a razor blade on the dresser with blood around it; that it seemed to be a Gillette double-edged razor blade.

In rebuttal the appellants, by their evidence, proved the will of Mr. Mull, in which his widow was the sole beneficiary; that the survivors in the partnership of Home Building Supply Company had purchased from the widow her interest in that business; that the deceased had been successful in business, starting as a telegraph operator and working himself into a position of responsibility as cashier of the local bank at the time of his death; that he was cheerful, optimistic and was planning further business enterprises shortly before his death. The appellants made no direct attack upon the testimony in regard to the death of the deceased and circumstances attending such death. They merely contend

that all of the evidence in behalf of the appellee was insufficient to warrant the action of the trial court in taking the case from the jury and entering judgment for the appellee, thus holding, in effect, that the evidence was conclusive that Mr. Mull came to his death by his own hand.

The appellants, by their first three points, assail the sufficiency of the evidence to establish conclusively that the deceased came to his death by his own hand. They cite and quote from many cases in the jurisprudence of this State and other States in which suicide was urged as a defense to an action upon a life insurance policy. The general proposition of law urged is undoubtedly correct, which is that when the testimony in regard to such a case is of such a nature that reasonable minds might differ as to whether the deceased came to his death by some voluntary act of his own with the intention then and there to take his own life a question of fact is presented and it is for the jury to decide from the evidence whether the deceased took his own life. The presumption against suicide is a rule of law and not a rule of evidence, and such presumption cannot stand when the evidence submitted establishes facts to the contrary. We believe that the evidence in this case, which is summarized above, completely overcomes the presumption of law relied upon here by the appellants. Such testimony shows that the death of the insured was unquestionably due to his own voluntary act, and since there was no testimony in the record on which one might base a conclusion to the contrary, any finding by a jury to the contrary would not have been supported by the evidence and the trial court was correct in taking the case from the jury and entering judgment for the appellee.

The appellants in their brief point out that Dr. Scofield, the doctor who performed an autopsy on the body of the deceased, testified that the deceased "had a traumatic compound fracture of the third rib on the right side with a perforation of the heart; he died from hemorrhage; the cause of his death was heart injury from fracture of his rib caused by his fall." From this they argue that the word "fall" connotes an unintentional act, without fore-

sight or design; and that such testimony by Dr. Scofield is binding upon the appellee and that such proof is from a legal standpoint that Mr. Mull fell from the hotel room window without design on his part and that such testimony negatives the idea of suicide. The witness Dr. Scofield was the doctor who performed the autopsy. He was not and could not have been testifying as to the intent or lack of intent on the part of the deceased when he went through the hotel room window. He was not present at that time and knew nothing of the occurrence until he performed the autopsy. He was testifying as to what he saw and found upon the body of the deceased. His testimony cannot be considered as having any bearing upon whether or not the deceased accidentally fell or intentionally jumped through the window.

The immediate cause of the death of the deceased is of no importance here, because the sole issue before the court was whether the evidence showed that he died as a result of his own act or acts, and if his death resulted from his act of cutting his own throat or his act in going through the window or both of such acts then the evidence established that he died by his own hand, intentionally. The evidence here showed conclusively that the insured had gone to the State Psychopathic Hospital in Galveston for treatment of a mental and emotional disturbance; that he voluntarily left the hospital and went alone to the Powell Hotel without baggage, registered alone in Room 306, went to his room, locked his door, severed the large artery in his neck with a safety razor blade and set fire to his bed; that when the night clerk was attemping to put out the fire in his room he got off the bed himself, walked to the window and went through it with considerable force and landed on a roof one story below; that on the same day he had written a farewell letter to his wife informing her in substance that he was going to take his own life; that he died as a result of his own voluntary acts.

The proof is undisputed that the deceased was suffering from an emotional illness of a depressed type prior to the day of his death and that on the very day of his death he was undergoing treatment for such ill-ness and that he was to return to the State Hospital in Galveston for electro-shock treatments.

By their points Nos. 4 to 12 the appellants complain of the action of the trial court in admitting in evidence the testimony of Dr. Tom McMillan. Dr. Mc Millan's testimony is briefly summarized in the statement above. Complaint is made of many of the questions asked Dr. McMillan and answers given by him. We have carefully examined the appellants' brief and the authorities cited therein and have concluded that no error is presented in these points. It is pointed out that as a general rule any competent evidence which tends to prove or disprove an issue of suicide in an action on an insurance policy is admissible. The courts permit great latitude of inquiry to determine the insured's state of mind and the existence of a motive for self-destruction in a suit on ·life insurance policies where suicide is an issue. 46 C.J.S., Insurance, § 1337, page 480 and authorities there cited. Because of the fact that Dr. McMillan was the physician to whom the deceased was taken for treatment, and because of the type of emotional illness for which he was being treated we believe that the witness was peculiarly qualified to testify to all the matters related by him and admitted by the court in evidence.

Appellants' 13th point complains of the action of the trial court in permitting Dr. McMillan to testify in response to a hypothetical question to the effect that in his opinion the deceased was conscious of the fact that death could be produced by severing the large blood vessels in the neck. This was a proper question of inquiry under the circumstances shown by this record and no error is presented by this point.

Point No. 14 complains of the action of the trial court in admitting in evidence the testimony of Dr. Scofield, the doctor who performed an autopsy on the body of the deceased, over the objection of the appellants. The witness testified that he performed the autopsy on the authority of the Justice of the Peace of Precinct One of Galveston County, Texas, for the purpose of ascertaining the primary cause of death. Under the authority of Articles

968 and 970 of the Code of Criminal Procedure, Vernon's Ann. C.C.P. arts. 968, 970, a justice of the peace is clothed with the authority to order an autopsy upon the body of one who dies under such circumstances as are revealed by this record to have surrounded the death of Mr. Mull. The objection to the testimony and points presented show no error in admitting such testimony by the doctor.

Point 15 urged by the appellants is that the trial court erred in permitting Dr. Scofield to testify that in his professional opinion the physical injuries he found on the body of Mr. Mull other than the cut or laceration on the neck were of such a nature as could have been reasonably caused from jumping from the third story window and landing on a roof projecting from the second floor. Appellants' complaint is directed to the use of the word "jump" and say that this assumed a fact not in the record. We are unable to see how the extent and nature of the injuries found by the doctor could have been affected, whether the deceased fell or jumped from the window since he was testifying to physical conditions he found on the body at the time of the autopsy. The point is overruled.

Points Nos. 16, 17 and 17a all complain of the action of the trial court in allowing the witnesses Mrs. Mull, the widow, Mr. Grady, the father-in-law, and Mrs. Davis, sister-in-law of the deceased, to testify in regard to the contents of the letter written by the deceased to Mrs. Mull when the letter itself was not produced at the trial but had been burned by Mrs. Mull. The circumstances as to the receipt and reading of the letter by members of the family of the deceased and in the presence of their minister, and the destruction of it by Mrs. Mull are set forth in the statement above in the first part of this opinion. We believe such circumstances made the contents of the letter admissible. The appellants argue, however, that such letter was from a person not a party to the suit to another person who is not a party to the suit and was thus inadmissible in evidence. The admissions against interest, even of a stranger or parties not of record, are sometimes admissible in evidence. See 17 Tex. Jur., pg. 547. In this case a letter written by the insured to his wife on the date of his death, revealing an intention to destroy himself, must be admitted in evidence. Since the sole issue in the trial of this case and on appeal was whether or not the insured came to his death by his own hand, such a letter must be admitted in evidence no matter who are the beneficiaries in the policy sued upon or who are the parties to the suit. Such a holding would be required even if the general rule noted above were not in existence, that is, that a wide latitude is granted trial judges in reception of evidence where suicide is an issue in an action upon a life insurance policy.

Points 18, 19 and 20 complain of the action of the trial court in admitting some of the testimony of Mr. Grady, father-in-law of the deceased. Mr. Grady was permitted, over the objection of the appellants, to testify that the letter from the deceased was written on the date of his death; that he was present when the letter was read that the deceased wrote to his wife; that deceased told him that he was nervous. It is believed that the writing of the letter by the deceased has been fully established by this record. Everyone who saw the letter was in position to know and was familiar with the handwriting of the deceased, and it is not disputed that the letter was in his handwriting and dated the day of his death. The propriety of allowing Mr. Grady to testify that the deceased had told him that he was nervous cannot seriously be questioned. The father-in-law was apparently on the best of terms with the deceased and provided the money for the deceased and his minister to go to Galveston for treatment in the hospital. He had been with the deceased a great many times and a statement by the deceased to him that he was nervous presents no error in this record.

The appellants' points Nos. 21 to 26, inclusive, present detailed objections to a great deal of the testimony of the witnesses Elsie Powell, E. W. Bennett and W. J. Whitburn. We have examined these points with care and believe that on the whole the testimony objected to was admissible and no error is presented by any of such points.

528

■ Points Nos. 27 and 28 complain of the action of the trial court in excluding testimony by the witness Pilcher, and of the refusal of the trial court to allow argument by counsel upon the question of the admissibility of such testimony. The testimony objected to was inadmissible since it would have been an opinion and conclusion of the witness on matters of which he had no knowledge. The court permitted a rather full bill of exception on the matter in which all the arguments are included. No harm is shown to have been done appellants by any of the matters included in these points.

■ Appellants' 29th and last point complains of the action of the trial court in overruling their objections to questions and answers contained in the deposition of Dr. Tom McMillan, a witness in behalf of the appellee. Notice to take the deposition of Dr. McMillan was served on Thomas A. Wheat, who was one of the attorneys of record for the appellants at that time. The appellants contend that Mr. Wheat is not an attorney for them and that the record does not show any service upon them or their attorneys. A supplementary transcript has been filed by the district clerk of Liberty County which shows that the name of Thomas A. Wheat was at one time on the petition of the appellants and lines had been drawn through such name and the name of C. V. Cain written above it. With the record in this condition it is apparent that when the trial court overruled appellants' objection to the introduction of the matters contained in the deposition of Dr. McMillan, he was acting within his discretion and thereby determined that such notice had been served on one who appeared as attorney of record at the time such notice was served. Such a ruling will not be disturbed and the point is overruled.

From a careful perusal of all the testimony we believe that the conclusion therefrom is inescapable that the insured in the insurance policy sued on came to his death by his own hand and the trial court did not err in taking the case from the jury and entering the judgment which was entered.

The judgment of the trial court is affirmed.