110 N.J. Super. 391 (1970)
265 A.2d 830
LORRAINE G. BIRO, PLAINTIFF-RESPONDENT,
v.
PRUDENTIAL INSURANCE COMPANY OF AMERICA, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 2, 1970.
Decided May 29, 1970.
*393 Before Judges GOLDMANN, LEWIS and MATTHEWS.
Mr. Richard H. Woods argued the cause for appellant (Messrs. Hiering, Grasso, Gelzer & Kelaher, attorneys; Mr. Thomas F. Kelaher, on the brief).
Mr. Benjamin Weiner argued the cause for respondent (Messrs. Weiner & Schoifet, attorneys; Mr. Edward J. Egan, on the brief).
The opinion of the court was delivered by LEWIS, J.A.D.
Plaintiff, as beneficiary, instituted suit against defendant, carrier on a policy of life insurance, seeking the face amount thereof and accidental death benefits. Defendant denied liability on both counts, contending that the insured, plaintiff's husband Robert Biro, had committed suicide. The accidental death claim was abandoned during trial and the jury returned a verdict in plaintiff's favor for the policy amount of $25,000, plus interest and costs.
The background facts are uncomplicated. On Sunday, April 16, 1967, shortly after 11 P.M., plaintiff discovered her husband in the garage of their home, in back of the steering wheel of his automobile "slouched over to the passenger side," in an unconscious condition. The motor of the car was running, the doors of the garage were closed, and it was "smoky" with noxious fumes. Plaintiff and a neighbor, *394 who came to her assistance, noticed an odor of alcohol about Robert and, believing him to be drunk, they carried him through the den, adjacent to the garage, and placed him on a couch in the family room. After the neighbor left and plaintiff supplied a pillow and covered her husband with a blanket, she went to bed. Unable to awaken him in the morning she telephoned her father and summoned the local First Aid Squad. The family physician was called, and he pronounced Robert dead.
The death was investigated by State Trooper Walsh and Dr. Malcolm Gilman, then Monmouth County Physician (a position now designated as Monmouth County Medical Examiner).
Walsh testified that three empty pill containers, a broken glass and a pint bottle of blackberry brandy, 1/4 full, were found on the desk in the den, and "on a fold" in the blotter there was a small white piece of notepaper with pencil writings thereon. He also stated that the car was a 1966 [sic 1967] Pontiac which
showed no physical signs of being worked on. There were no tools inside of the car [within view] or laying [sic] outside of the car, although tools were on a bench and hanging on the walls of the garage. The deceased's hands showed no signs of dirt or grease. The hands were clean. The car was spotless inside as well as it was outside.
An autopsy performed by Dr. Gilman revealed that the physical cause of death was asphyxiation by carbon monoxide and alcohol.
Plaintiff testified that her husband was 26 years of age. He constantly "worked on his car" and would, upon occasion, tune up the engine in the garage, always leaving the garage door open "slightly." She admitted that for a period of time preceding his death there had been serious marital discord. Nevertheless, she stated that their disagreements had been resolved, that Robert had just purchased a part-interest in a tavern, they had planned a vacation motor *395 trip to begin the following Tuesday or Wednesday and that her husband was to have commenced working full time at the tavern upon his return from vacation.
In her testimony plaintiff said that Robert was a "very heavy" drinker and that prior to his death he had been drinking to excess. She further testified that on the evening of April 16 she and Robert ate a pizza pie and "had a couple of beers." She then put their daughter to bed, while Robert had another few drinks and went into the garage (dressed in his bathrobe, underwear and slippers) to check the windshield wipers and radio of the automobile in preparation of their trip. While she was watching a television movie she heard the motor of the car turned on and off several times. At the end of the picture she went to the garage to inform Robert that the "show" was over, at which time she found him in the car in the condition mentioned above.
The report from the State Police Laboratory was introduced into evidence. It indicated that Robert's blood sample contained 45% carbon monoxide hemoglobin and 0.046% ethyl alcohol (an amount of alcohol which statutorily gives rise to the presumption that one driving an automobile in such a condition is not under the influence of intoxicating liquor. N.J.S.A. 39:4-50.1). Moreover, the laboratory report indicated that there was an absence of any librium or any barbiturate traces in the stomach of the deceased.
Defendant alleges on appeal that the trial court erred in refusing to admit into evidence (1) the official certificate of death, (2) the opinion of Dr. Gilman as to the cause of death, (3) an opinion by Trooper Walsh as to the cause of death, and (4) a note found on decedent's desk in his den. These points will be considered seriatim.

(1)
The death certificate was signed on April 17 by the county physician who noted therein that death was due to "carbon monoxide, alcohol and librium." The doctor checked with *396 an "X" the suicide block (one of three blocks, accident-suicide-homicide) above the words "to the best of my knowledge," thus indicating his opinion that decedent had committed suicide. The trial court refused to admit the death certificate into evidence, although it did admit in evidence the State Police Laboratory report which bore the heading, "Michael J. Biro Apparent Suicide."
The records of a county medical examiner are viewed with such a degree of trustworthiness and reliability that they are "considered public records" and "shall be received in any court in this State as evidence of the matters and facts therein contained." N.J.S.A. 40:21-30.10. (Emphasis added). Cf. N.J.S.A. 52:17B-92. The much broader statute, N.J.S.A. 2A:82-12, which relates to all "copies and records of returns of vital statistics," declares that any original certificate "shall be received as prima facie evidence of the facts therein stated * * *." These statutes iterate the public record exception to the hearsay rule now embodied in Evidence Rule 63 (15). See Aitken v. John Hancock Mutual Life Ins. Co., 124 N.J.L. 58, 60 (E. & A. 1940).
Recently our Supreme Court considered these legal principles in a manslaughter case, State v. Reddick, 53 N.J. 66, 68 (1968), and held that a trial judge correctly admitted into evidence a report of the medical examiner, who had died prior to trial, after excising from it all matters of opinion as to the cause of death. Nonetheless, the question of the admissibility of such evidence in a suit to enforce an insurance contract, wherein the defense of suicide is raised, is one of novel impression in New Jersey. The one case in which this issue lurked in the record was decided prior to our present evidence rules and failed to resolve the precise question before us. See Devlin v. Surgent, 18 N.J. 148, 155 (1955).
Suicide is, generally speaking, a defense to the enforcement of an insurance policy. 43 Am. Jur.2d, Insurance, § 1195, at 1112 (1969). There is a divergence of *397 opinion in decision of other jurisdictions that have wrestled with the problem of admitting a death certificate as prima facie proof of a suicide death. See 5 Wigmore, Evidence (3d ed. 1940), § 1646, at 586; Annotation 21 A.L.R.3d 418, 449-156 (1968).
A review of the cases precluding admission indicates that the exclusion was generally predicated on either (1) the lack of a statute making such a report presumptive evidence of the "matters and facts" therein stated, see New York Life Ins. Co. v. Anderson, 66 F.2d 705, 706 (8 Cir.1933); Carson v. Metropolitan Life Ins. Co., 156 Ohio St. 104, 100 N.E.2d 197, 203 (Sup. Ct. 1951); World Insurance Company v. Kincaid, 145 So.2d 268, 275 (Fla. App. Ct. 1962), cert. den. 157 So.2d 517 (Fla. Sup. Ct. 1963); 30 Am Jur.2d, Evidence, § 1009, at 143 (1967); or (2) the failure of a proper foundation, inherent in the report, to support an opinion, see New York Life Ins. Co. v. Miller, 65 App. D.C. 129, 81 F.2d 263, 268 (1935); Schmidt v. Supreme Council of Royal Arcanum, 207 S.W. 874, 877 (Mo. App. Ct. 1919); Morton v. Equitable Life Ins. Co., 218 Iowa 846, 254 N.W. 325, 96 A.L.R. 315 (Sup. Ct. 1934); Annotation, 28 A.L.R.2d 353, 364-365 (1953).
In contradistinction, as previously noted, our statutes declare such a report to be prima facie evidence of the "official determinations contained therein," Szumski v. Dale Boat Yards, Inc., 48 N.J. 401, 406, cert. den. 387 U.S. 944, 87 S.Ct. 2077, 18 L.Ed.2d 1331 (1967), and our evidence rules permit expert opinion on the ultimate issue. Evidence Rule 56(3) provides that "Testimony in the form of opinions or inferences otherwise admissible under these rules is not objectionable because it embraces the ultimate issue or issues to be decided by the trier of the fact." See also Report of the New Jersey Supreme Court Committee on Evidence 110 (March 1963). This practice is consonant with many jurisdictions which have admitted death certificates if made pursuant to a statute and the record thereof was properly kept as required by law. Metropolitan Life Ins. *398 Co. v. Butte, 333 F.2d 82, 83 (10 Cir.1964); Fleetwood v. Pacific Mut. Life Insurance Company, 246 Ala. 571, 21 So.2d 696, 700 (Sup. Ct. 1945); Annotation, 96 A.L.R. 324, 324-325 (1935); cf. State v. Reddick, supra; Nestico v. D.L. & W.R.R. Co., 4 N.J. Misc. 418, 420, 133 A. 83, 84 (Sup. Ct. 1926).
Pragmatically, such proof is mere evidence only and not conclusory. See, e.g., Aetna Life Ins. Co. v. McLaughlin, 370 S.W.2d 229, 235 (Tex. Civ. App. 1963), rev'd on other grounds 380 S.W.2d 101, 9 A.L.R.3d 1005 (Tex. Sup. Ct. 1964); Annotation, supra, 21 A.L.R.3d, at 449-452. Here the medical examiner was available for cross-examination and there appears to be no reason why the jury should have been deprived of the benefit of the official record subject to full interrogation of the author, the county medical examiner, as to the "matters and facts therein contained." Both the report and the doctor's testimony were relevant and illuminative. As Professor McCormick so aptly stated, "A brick is not a wall," McCormick, Evidence, § 152, at 317 (1954), and the evidence thus adduced would not compel a particular verdict.
Singularly persuasive is the reasoning of Justice Frick of the Utah Supreme Court:
* * * if the plaintiff * * * is not satisfied with the statement contained in the certificate of death, he may always contradict the record by any proper evidence. Again, he may always call the attending physician and have him explain, if explanation be deemed necessary. * * * If, therefore, a certificate conforms to the statute, and is properly certified, there is no room for judicial construction or interpretation respecting its meaning nor to what extent it constitutes prima facie evidence. [Bozicevich v. Kenilworth Mercantile Co., 58 Utah 458, 199 P. 406, 17 A.L.R. 346, 350 (Sup. Ct. 1921)]
Dean Wigmore has argued that, "A main purpose of the system would be defeated if the records [a death certificate] were not liberally available in litigation." Wigmore, supra, § 1646, at 591. See Branford Trust Co. v. Prudential Ins. Co., 102 Conn. 481, 129 A. 379, 381 (Sup. Ct. Err. 1925); *399 cf. State v. Reddick, supra, 53 N.J., at 68; Miller v. Trans Oil Co., 18 N.J. 407, 413 (1955).
In our view an official death certificate made and filed as required by law is admissible as prima facie evidence, but all matters of opinion therein should be excised if the certifying medical examiner is not available for cross-examination.

(2)
The trial judge refused to permit the medical examiner to testify as to his opinion on whether decedent had committed suicide; he ruled that the witness could not opine a "legal conclusion."
The prime objection to the admission of such testimony is that a conclusion of suicide necessitates a finding of the intention of the decedent. It is argued that a medical expert, competent to testify as to the physical cause of demise, has neither the expertise nor the factual foundation to give an opinion regarding intention. Indeed, a foundation for an opinion must be demonstrated, Evidence Rule 19, because a conclusion based upon a supposition by one having no greater skill than the trier of fact is inadmissible. Priest v. Poleshuck, 15 N.J. 557, 563 (1954). In the present case there was an adequate foundation. The witness was the county physician, who not only conducted the autopsy but also observed the decedent's body prior to the autopsy as well as the surrounding conditions where death occurred.
The crux of the instant problem is the application of Evidence Rule 56, "Testimony in the Form of Opinion," which in pertinent part reads:
* * * (2) If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (a) based primarily on facts, data or other expert opinion established by evidence at the trial and (b) within the scope of the special knowledge, skill, experience or training possessed by the witness. (3) Testimony in the form of opinions or inferences otherwise admissible under these rules is not objectionable because it embraces the ultimate issue or issues to be decided by the trier of fact. [Emphasis added]
*400 This rule was adopted to avoid the traditional restriction on opinion testimony that a witness could not "usurp the function" of the trier of fact. See, e.g., Klinke v. Great Northern Life Ins. Co., 318 Ill. App. 43, 47 N.E.2d 506, 509 (App. Ct. 1943). Cf. Bergen County Traction Co. v. Bliss, 62 N.J.L. 410, 415 (E. & A. 1898); Report of the New Jersey Supreme Court Committee on Evidence, supra. The rationale underlying the exclusion was that there existed a "moral impropriety or a tactical unfairness in the witness' expression of opinion." Dean Wigmore viewed this reasoning as "empty rhetoric" and declared, "it should be entirely repudiated." 7 Wigmore, supra, § 1920, at 17. See also McCormick, supra, § 12, at 26; Tyree, "The Opinion Rule," 10 Rutgers L. Rev. 601, 605-606 (1956). But see McClelland v. Great Southern Life Ins. Co., 220 S.W.2d 515 (Tex. Civ. App. 1949).
The test of admissibility of such testimony has been defined as
* * * whether the witnesses offered as experts have peculiar knowledge or experience not common to the world which renders their opinions founded on such knowledge or experience any aid to the court or jury in determining the questions at issue. [Rempfer v. Deerfield Packing Corp., 4 N.J. 135, 142 (1950)]
See also Nesta v. Meyer, 100 N.J. Super. 434, 442 (App. Div. 1968). Appropriately restated, the standard for admission appears to be that "the jury should have help if it is needed." 7 Wigmore, supra, § 1921, at 18. "The modern tendency is to receive such expert testimony where it appears that the trier of the facts would thereby be assisted in the solution of the ultimate problem." Shutka v. Pennsylvania R.R. Co., 74 N.J. Super. 381, 401 (App. Div.), certif. den. 38 N.J. 183 (1962). Note, Pincus v. Sublett, 26 N.J. Super. 188 (App. Div.), certif. den. 13 N.J. 294 (1953). Accord, 31 Am. Jur.2d, Expert and Opinion Evidence, § 22, at 520 (1967).
*401 Any testimonial or experimental weaknesses of the witness can be exposed on cross-examination, and the credibility and weight to be accorded his testimony are in the domain of the trier of fact. Angel v. Rand Express Lines, Inc., 66 N.J. Super. 77, 85-86 (App. Div. 1961); 31 Am. Jur.2d, supra, at 521. It has been observed:
* * * any details which the expert has personally observed can be elicited either on direct examination or on cross-examination, and these details can be associated with the other grounds for the general conclusion; and if it is discovered that any essential facts have been overlooked, the weight of his opinion will thereby be weakened or entirely destroyed. The opinion of an expert, the grounds upon which it has been formed, and the weight to be accorded to it are all matters for the consideration of the jury. [Langenfelder v. Thompson, 179 Md. 502, 20 A.2d 491, 494 (Ct. App. 1941)]
Unlike State v. Reddick, supra, where the assistant medical examiner who performed the autopsy had died prior to the trial, here the county physician was in court and was available to testify and to be cross-examined with respect to his opinion as to the cause of death as reflected in the official death certificate which was a matter of public record. We hold that it was prejudicial error on the part of the trial court to refuse to permit the county physician, in the circumstances of this case, to testify as to his opinion on the issue of suicide.

(3)
The trial judge excluded testimony of the investigating state police officer as to whether the death was a suicide.
Although the witness had six years of police experience and his investigation of decedent's death was in the performance of his official duties, he was not an expert and his opinion testimony was not admissible under the nonexpert opinion rule. Evidence Rule 56(1). Accordingly, the trial judge properly ruled that the proffered evidence be excluded since the officer could not give an opinion rationally based on his own experience and perception. This *402 exclusion was an appropriate exercise of judicial discretion. See Evidence Rules 4, 8(1) and 19. Absent a clearly erroneous exclusion or plain abuse of discretion, the decision of the trial judge should not be disturbed. Sanzari v. Rosenfeld, 34 N.J. 128, 136 (1961); Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 411 (1960).

(4)
Defendant argues that a scribbled note, admittedly in decedent's handwriting, found on a desk in decedent's den, "where the bottle of brandy and pill bottles were found," was improperly excluded from evidence. The writing was not admitted because the time of its making was not established, and the trial judge viewed it as unduly prejudicial.
The undated note contained a list of odd jobs to be performed about the house, followed by a two-column list of words and doodled symbols of apparent religious connotation. It is indeed, questionable whether the writing was a "suicide note." Hence, it appears that the note was properly excluded under Evidence Rule 4 which provides:
The judge may in his discretion exclude evidence if he finds that its probative value is substantially outweighed by the risk that its admission will * * *
(b) create substantial danger of undue prejudice or of confusing the issues or of misleading the jury.
See Stoetling v. Hauck, 32 N.J. 87, 103 (1960).
The challenged rulings of the trial court are affirmed in part and reversed in part, and the matter is remanded for a new trial consistent with this opinion.
MATTHEWS, J.A.D. (dissenting).
My disagreement with the majority opinion arises because I believe it focuses on the error of the trial judge's stated reason for excluding the medical examiner's testimony, i.e., that the witness *403 could not opine "a legal conclusion," instead of on the substantive issue involved, i.e., what is the scope of expertise of a medical examiner.
In Priest v. Poleshuck, 15 N.J. 557 (1954), Mr. Justice Heher, in his opinion for the court, stated:
Knowledge is requisite to testimonial qualification. In assaying opinion evidence, for competency, the distinction is generally between the expert and the non-expert  the witness who is skilled and specially experienced in the particular field, and the witness who has only the common knowledge and experience of mankind. From the latter, only facts perceived by the use of their senses, and not mere opinion, inferences, or conclusions based upon the facts supposedly within their knowledge, are adducible in evidence, for the assessment of the facts involving common knowledge and experience is the exclusive province of the jury or other fact-finding authority. The witness in the latter category cannot offer his opinion of the probative worth of the facts. But he has more leeway where the facts are incapable of reproduction and comprehension by mere description. And testimony is of necessity ofttimes compounded of both fact and opinion. [at 562; citations omitted]
The majority, recognizing this rule, finds there was an adequate foundation for the testimony by the medical examiner. They state that "The witness was the county physician, who not only conducted the autopsy but also observed the decedent's body prior to the autopsy as well as the surrounding conditions where death occurred."
Mr. Biro was found slumped over in the front seat of his car with the motor running and the garage door closed. He died, apparently, of carbon monoxide poisoning and alcohol. The medical examiner did not find the body nor did he move it. He saw the body after it had been removed to a couch in the recreation room of decedent's home where it had rested for a number of hours.
It escapes me why the medical examiner is considered specially competent to testify to whether Biro accidently fell asleep, fell into a drunken stupor from which he never recovered, was felled by carbon monoxide gas while working on his car, or committed suicide. In reaching his suicide conclusion, the medical examiner had to depend upon facts *404 which were related to him by plaintiff and others  facts of which he had no direct knowledge.
Every witness called in a legal proceeding is permitted to make conclusions within the scope of his imputed knowledge. Such statements as "it was hot," "he was drunk," "she was driving 80-90 miles per hour," are examples of these types of conclusions. An expert witness merely has an expanded body of knowledge or skill in one or more particular fields which are beyond the scope of laymen called for jury service. It is to help the jurors that he is permitted to testify as to conclusions to be drawn from the scope of his enlarged expertise.
A medical examiner is probably uniquely situated to draw such conclusions as "X died of carbon monoxide poisoning," "X died of a blow to the rear of the head," "X died in a particular position and was moved," or "X was killed by a bullet which entered his brain and was fired at an angle of 30 degrees from the horizontal from no shorter than 300 yards." However, a medical examiner has no special competence to testify as to the perpetrator of the bullet in the last given example. Whether X rigged a high-powered rifle to kill himself as he stood in a certain place, or whether X was assassinated, depends on the jury's evaluation of a medical examiner's conclusion as to physiological causation and also on other evidence produced on the matter.
The majority ignores the difference between a conclusion of the medical examiner that "X died of carbon monoxide poisoning and alcohol" and "X died of carbon monoxide poisoning and alcohol by his own hand and he intended to kill himself." I believe that permitting the medical examiner to testify as to the conclusion of suicide, as the majority would, tends to mislead the jury into thinking that he knows something that they do not know. What is at stake here is nothing less than the myth cult of the expert to whom too many individuals are inclined to look for wisdom. My position does not derive from an anti-expert bias, but from a respect for the duties and limits of the jury. I believe that *405 the admission of such a conclusion would confound and distort the delicate balance which is the fact-finding process. The jury is perfectly competent, given the medical and physical evidence, to come to its own conclusion about whether the death was a suicide. The majority also cites the Report of New Jersey Supreme Court Committee on Evidence, p. 110, (March 1963) as supportive of its conclusion. I draw attention to other language on that same page:
In Shutka v. Pennsylvania R.R. Co., 74 N.J. Super. 381, 181 A.2d 400 (App. Div), certif. denied, 38 N.J. 183 (1962), the Appellate Division, citing Uniform Rule 56 (4), recently held that it was proper to permit an expert witness to give an opinion on an ultimate fact, the test being whether "the trier of the facts would thereby be assisted in the solution of the ultimate problem."
The Committee also pointed out that
* * * such questions as "Was the defendant negligent?" "Is the accused guilty?" or "Did the defendant have reasonable cause to institute the prosecution?" would be impermissible on the basis either that under 56 (1) (b) they are not "helpful," or under Rule 45. (at 110).
I believe there can be properly added to the above list questions such as "was this second degree murder?" and "was this suicide?"
With respect to the admission of the contents of a certificate of death which is governed by N.J.S.A. 2A:82-12, declaring that any original death certificate "shall be received as prima facie evidence of the facts therein stated * * *," I believe that the majority ignores that the statute refers to facts and not conclusions. "Suicide" is not a fact but a conclusion. Suicide includes both the notion of the instrumentality of death being the decedent (directly or indirectly) and the notion that the decedent intended to take his own life. The medical examiner's checking of the suicide box on the death certificate is merely a shorthand way of stating his conclusion that the elements of suicide are made out.
*406 The trial judge, in my view, came to the right result (i.e. exclusion) for a slightly erroneous reason. The proposed testimony of the medical examiner was not a "legal conclusion," but a conclusion, an opinion, for which the medical examiner had no special competence.
I concur in so much of the majority opinion as is set forth in points three and four with respect to the testimony of the state police officer and the admission of the so-called suicide note.
I would affirm.