**AETNA LIFE INSURANCE COMPANY,**
Appellant,

v.

Winifred H. McLAUGHLIN, Appellee.

No. 13971.

Court of Civil Appeals of Texas.

Houston.

July 11, 1963.

Rehearing Denied Sept. 12, 1963.

Fouts, Moore, Williams & Caldwell, Houston, T. J. Caldwell, Jr., Harold L. Ogden, Houston, of counsel, for appellant.

Bracewell, Reynolds & Patterson, William H. White, Houston, for appellee.

BELL, Chief Justice.

Appellee, surviving widow of Washington L. McLaughlin, sued appellant to recover on a group accidental death and dismemberment policy of insurance issued by appellant to Southwestern Drug Corporation for the benefit of the employees of the latter. Mr. McLaughlin was an employee of the Drug Corporation. He was killed when hit by a bus on February 22, 1959. The accident occurred just after midnight on the Houston-Hempstead Highway near its intersection with West Little York Road in Harris County. Appellee's theory was that death was accidental. Appellant's theory was that it was the result of suicide. The jury found it was not the result of suicide. The court rendered judgment for appellee against appellant for $6,500.00, the amount of the policy, together with the statutory penalty and interest and $2,184.00 as attorney's fees.

Appellant's policy excepted from the risk, among other things, death resulting from suicide by the employee whether he was sane or insane. As an affirmative defense appellant pled in this manner:

"For further special answer herein this Defendant would respectfully show that policy and certificate of insurance sued upon by Plaintiff herein each provide, among other things, that the insurance thereunder does not cover any loss caused directly or indirectly, wholly or partly, or contributed to sub-

stantially by bodily or mental infirmity; or suicide, sane or insane. *This Defendant pleads the death of Washington L. McLaughlin was caused by suicide."* (emphasis ours)

The court submitted only an issue on whether death was caused by suicide. The issue and accompanying definition were in this form:

"Do you find from a preponderance of the evidence that the death of W. L. McLaughlin was not the result of suicide?

"Answer: It was the result of suicide or It was not the result of suicide.

"You are instructed that by suicide is meant intentional self destruction and that one may commit suicide although insane or intoxicated so long as the act is the result of the exercise of his own will in any degree, and he understands the nature and probable consequences of his act."

Appellant objected to the form of the issue in this manner:

"Each and all of the defendants (there were other defendant insurers under other policies who have not appealed) object to the Court's definition of the term suicide for the reason that it fails to advise the jury that in order for an act to be suicide it is not necessary that the person so committing suicide have a rational understanding of the nature and probable consequences of his act, and for the further reason that the phrase contained in such definition reading 'and he understands the nature and probable consequences of his act' is unnecessary and constitutes a comment on the evidence and should be stricken from such definition, and the defendants move that such phrase be stricken from the definition."

There were no special issues requested by appellant and no objection to the charge for failure to include other specified issues.

■ It is appropriate here to notice that in this appeal appellant contends that deceased's death resulted at least in part from bodily or mental infirmity because he was drunk from the use of alcoholic beverages at the time of his death and this condition could be said to be in part the cause of his death because it caused him to go in front of the bus. Appellant cannot rely on this theory even assuming it to cover the facts developed. First, it was not relied on in the pleading. It is true that appellant pled that such exclusion was in the policy, but it limited its defense by specifically pleading that death was caused by suicide. As shown above, appellant pled this exclusion was a part of the policy and the exclusion where death was the result of suicide, sane or insane, but it immediately followed *it with the specific allegation that deceased's death "was caused by suicide."* (emphasis ours) The effect is to give notice that it was only relying on suicide as a defense. Had there not been this limiting allegation, the other allegations, in the absence of special exception, would probably have been sufficient. Exclusions in the policy are affirmative defenses and are waived if not pled. Rule 94, Texas Rules of Civil Procedure. Second, it may not rely here on the defense because there was neither a request for an issue submitting this independent ground of defense, nor an objection to the charge for failure to include a submission of this theory. Since such issue would have been appellee's an objection to the omission would have sufficed. There was thus a waiver of any such defense. Rule 279, T.R.C.P. If it be thought a jury finding was unnecessary because intoxication was indisputably established, it is to be answered that in such case a requested conclusion on the independent ground of recovery must be requested in the motion non obstante veredicto or for instructed verdict. Meacham v. Loving, 155 Tex. 279, 285 S.W.2d 936.

■ Apart from alleged procedural errors, which we will later notice, appellant contends that the jury's answer finding

death was not the result of suicide is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong. In appraising this point we must consider the entire record. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660. Also the position of appellant is that the charge given was erroneous because its policy excluded death by suicide, sane or insane, and the effect of the charge is to allow recovery even though deceased was insane from drinking alcoholic beverages. Apparently its position here is that if the probable consequences of the acts that the insured does are such as will result in his death, his beneficiary cannot recover even though he may actually have had no purpose to destroy himself. Expressed otherwise, its contention is that even though deceased was so drunk he could form no intention to take his life, there can be no recovery if the acts of deceased were such that had they been committed by a sane person, such person could not recover. Its position is that though deceased may not have been able to rationalize his lunging in front of the bus, still there can be no recovery because a sane person doing that act could not recover. On the other hand, appellee's position is that to be a suicide there must be a purpose on the part of the deceased to destroy himself. We think the substance of appellee's position is that by its very definition suicide is intentional self destruction and if one is in such condition that he cannot form such an intent his death cannot be said to result from suicide. Also, appellee contends there was no evidence of insanity. We do not mean this is the sole contention of appellee. She also contends, apart from the mental condition of deceased, the evidence shows his death was purely the result of accident and shows the absence of any purpose to destroy his life.

We do not need to decide whether Texas follows the majority rule that where the policy excludes death by suicide, *sane or insane,* the acts of deceased will bar recovery, even though he was insane to the extent he could form no purpose to take his life, if such acts had they been committed by a sane person would be a bar to recovery for the death of such sane person. See 35 A.L.R. 166, 138 A.L.R. 829, and 153 A.L.R. 801. The minority view is that if the deceased is so completely insane as to be unable to understand the physical nature and consequences of his acts, then there may be recovery because in such case he does not intentionally take his life.

We think the case was tried below on the theory of the minority view.

We should here notice the evidence. It appears that deceased was a salesman for Southwestern Drug Corporation and had been for about twelve years. He had a fine record with the company and any drinking of intoxicants was not of such a nature as interfered with his work. There seems to have been some estrangement between deceased and his wife though he lived in the home with her. The evidence is such that the jury could easily conclude that there was not what would accurately be called an estrangement, but there was merely a state of complaint by appellee concerning deceased's drinking and his keeping company at times with other women. Deceased seems to have felt because of appellee's complaints that he was misunderstood. He nevertheless continued to live with appellee though they had not for some months prior to his death stayed in the same bedroom. Appellee testified their differences were not out of the ordinary.

A woman named Rita Romans was the one with whom he was having an affair at the time of his death. It is not necessary to notice her testimony with regard to the affair other than that he spent some very brief number of days at her apartment from time to time and that he wanted to get a divorce from his wife and then marry her. She was not interested in marriage. We must, however, notice her testimony as to deceased's conduct from Friday preceding his death until just a short time before his death when he got out of the automobile on West Little York Road just off of Hemp-

stead Highway. About 2 p. m. on Friday, February 20, 1959, deceased came to her home and they went to look for an apartment. About 7 p. m. they started for Granger, Texas, where deceased was reared. That night they stayed together at a motel in Taylor, Texas. Deceased was drinking whiskey all the way from Houston. Deceased drove around Granger showing his companion various spots that were fond to his heart. Saturday morning they went back to Granger and again visited places deceased remembered from his youth. They took some pictures of some of such places. They visited deceased's aunt. They rode around until they met an old settler that knew deceased's family. He and deceased talked about an hour. Deceased and Rita then ate. After eating they went to a motel in Taylor. Deceased got another bottle of whiskey and continued his drinking. She read and he watched television. After a time deceased began telling Rita that she did not love him. He kept "cussing and going on" and Rita took the whiskey and broke the bottle in the sink. He kept up his raving and Rita got mad and hit him on the shin with a pitcher. The pitcher broke, cutting him on the shin, and a piece flew up and cut him on the thigh. The cuts were pretty bad. She rendered first aid to him. Because of his conduct, she tried to call her mother in Houston but he would not let her. He thought she was trying to leave him and stated if she did he would get in front of a car and let it run over him and no one would know she had cut him. She stood in the door to prevent his going into the street and he knocked her down. She tried to call the motel office to ask that the police be called but he jerked the telephone from her. They went to the car. He planned to drive and when she tried to prevent it, he knocked her down. She then went into the motel and called Mrs. Spillman, deceased's niece, and told her what happened. By this time it was dark and deceased allowed Rita to drive. They started back to Houston. At Giddings he made her get him some more whiskey. They got to Brenham about 10 p. m. She was trying to

find a hospital. She finally found a man who said he would show her where one was. Deceased then said if she was going to leave him he might as well let a car run over him. Deceased got out of the car and walked down the middle of the street and Rita drove slowly behind him, keeping the car lights on him. He then got back into the car and they headed for Hempstead. Here they ate and he asked her to go to a motel but she said she was going on to Houston. He again started walking down the highway and she followed in the car with the lights on him. He ran in front of a car that pulled off the road. Soon he got back into the car and they drove toward Houston on the Hempstead Highway until they got to West Little York Road. They turned onto that road and he stepped on the brake, stopping the car. He jumped out and started toward the Hempstead Highway. He was walking on the shoulder of the road. She drove on and left him as she said she had had all she could take. She called his niece, Mrs. Spillman, and told her what had happened. She left the car in front of Mrs. Spillman's and left the keys and deceased's billfold in the door at Mrs. Spillman's. She found out the next morning about his death.

In appraising Rita Romans' testimony it should be noted that cross-examination revealed that she had during investigation been very cooperative with representatives of various insurers who were, or possibly might be, involved, and was extremely uncooperative in letting representatives of appellee know what she purported to know. Too, there were some things she said in her testimony in court that she did not put in her statement to the police. Further, she was shown to be a person of easy virtue.

Mrs. Spillman, the niece, was very close to deceased, having been reared in his mother's and father's home with him. She testified the last two or three years of his life he told her he was unhappy because his wife stayed in the room with her mother all the time and would not share his room. Too, he told her he was allowed only a dollar a day expense money. He was a mentally dis-

turbed person. He was nervous, unhappy, and he drank. She knew he was keeping company with Rita. He told her he was in love with Rita. About two months before his death he talked about the possibility of getting a divorce. He told her his wife was hard to talk to. On Thursday before his death she talked with deceased. He was tired and upset and said he was so tired and depressed he felt like walking in front of a car. He had previously said the same thing several times. It began years before when he came back from the army. Rita called her from Taylor and Hempstead, and then from Houston.

On cross-examination it was developed, as in the case of Rita Romans, that Mrs. Spillman was very cooperative in the investigation with insurers' representatives and very uncooperative with appellee's representatives. Too, it was brought out that she had not in some statements she had made told of all the times deceased was supposed to have threatened to take his life. When her deposition was taken she was unable to recall any such threats except on Thursday before his death. In her deposition she had said nothing about possible divorce from Mrs. McLaughlin and then marriage to Rita Romans. Though she was told of deceased getting out of the car at West Little York Road, she did nothing to notify Mrs. McLaughlin or go to his assistance.

Mr. Ismonde, an investigator for the Harris County Medical Examiner's office, who formerly did work with the claims service that investigated this case for the liability insurance carrier who carried insurance on the bus involved, testified when he called Mrs. McLaughlin and notified her of the death she told him she had been expecting something like this to happen because when he had on previous occasions been drinking he threatened to take his life. She said the same at the morgue. This was denied by Mrs. McLaughlin.

Evidence from numerous witnesses who visited deceased and appellee in their home spoke of deceased's congeniality, his happy nature and the apparent compatibility between them as husband and wife. They attended church together fairly regularly. Some witnesses worked with deceased. He was well liked. He was a valuable employee. He was in no wise in default in performance of his duties. He was a successful salesman. His drinking did not interfere with his work. There was no showing he was in any financial strain. No one else had ever heard deceased threaten to take his life. Too, he had never talked with his wife about a divorce.

The bus that hit deceased was chartered to take students of Spring Branch High School to a speech tournament at Waco. It was returning at the time of the accident. Mr. Rex Fleming, a teacher who was on the bus, testified about the actual collision. Just before the accident he heard the bus driver say something. The witness looked up and saw deceased in the left lane of Hempstead Highway. This would be the lane to be traveled in going from Houston to Hempstead. The bus was in the right lane coming into Houston. It was 50 or 60 yards from deceased. Deceased seemed to hesitate a moment. He then walked to the center lane, looked up at the bus, hesitated a moment and it looked like he was going to turn around and walk back. As the bus approached he threw his hands over his head and lunged in front of the bus. The manner in which he threw his hands up was demonstrated. We do not know what the demonstration portrayed. The jury saw it; they knew what was portrayed. Deceased was moving across the highway toward the shoulder on the right side coming into Houston. This shoulder would be where a person would go to catch a bus on the outskirts of a city. In a previous statement given a day or two after the accident the witness had said deceased moved toward the center and hesitated and then "ventured" in front of the bus. He said nothing about throwing his hands over his head.

Russell White was a student on the bus. He heard the driver honk the horn and look-

ed up and saw deceased standing in the highway about the middle of the left lane. The bus was traveling 50 or 55 miles per hour. While standing in the left lane deceased looked at the bus, went across to the center lane, stopped, again looked at the bus, and threw his hands over his head and this is when the bus hit him. It looked like he lunged just as the bus swerved. He demonstrated deceased's movement but we cannot tell from the record what posture was portrayed. In a statement previously given the witness had not said anything about deceased throwing his hands up. He lunged in the direction toward the shoulder on the right hand side of the highway.

The driver of the bus was so upset that apparently he was never able to talk about what occurred. He did not testify.

■■ We are unable to say that in the light of the whole record the jury's answer that deceased's death was not suicide is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong. The jury could have reasonably concluded that deceased did not deliberately lunge in front of the bus in order to kill himself, but rather he was attempting to cross the highway and on seeing the oncoming bus became confused and at the last moment lunged to get across the road ahead of the bus. The jury could have reasoned he was attempting to cross the road to catch a bus. He lived across Houston from where he was. He could get that great distance only by walking or by catching a ride. It is a matter of common knowledge that intercity buses stop along the highway between cities to take on passengers. While the accident occurred in the city limits, it was at a point about 15 miles from downtown Houston. The jury could have concluded, if it believed he threw his hands over his head, that this was reflex action on seeing he was going to be hit. It did not have to believe he threw his hands above his head because the witnesses in previous statements had not said so. Also there was a dispute concerning whether deceased

had previously threatened to take his life and if so how many times. The jury could have well concluded that he had not, in the light of all of the testimony. Too, they could have reasoned, if they believed Mrs. Spillman and Rita Romans about how frequently he threatened to take his life over a period of years, that such threats were idle ones made with no such intent but to gain attention.

■ We are of the view there was no error in overruling the objection made to the charge. The objection was that it failed to state deceased's understanding of the nature and probable consequences of his acts did not have to be rational. The definition as given made no requirement that his understanding be a rational one. In the light of the evidence adduced the court was seeking to find out if deceased purposed to take his life. Even though a person be insane to come within the exclusion of the policy he must have a purpose to take his life. Suicide is intentional self-destruction. Under the evidence no issue of insanity, apart from intoxication, was raised. The evidence does show deceased drank whiskey almost continuously from 7 p. m. Friday until his death early Sunday morning. It shows he was drunk. Dr. Crain testified a person could drink to the extent he could not form an intention to take his life. There was, we think, sufficient evidence to raise the issue of temporary insanity produced by the drinking of intoxicants. We are also of the view that if he was so drunk he could form no intention to take his life, then he did not commit suicide even if he walked in front of the bus, and we think it was tried on such theory. In any event, the charge given was sufficient to inquire if deceased purposed to take his life and there is no suggestion that his understanding of the nature and probable consequences of his act must be a rational one.

The charge given was not a comment on the weight of the evidence.

Appellant complains of the admission of the testimony of Dr. Crain, a psychiatrist,

that in his opinion in the light of the facts recited to him, the deceased did not intend to commit suicide. Dr. Crain gave his opinion in answer to a hypothetical question. He had never seen deceased. He was asked to read the statement of Rita Romans. Such statement was in substance the same as her testimony above recited. He was asked to assume the facts stated were true except with regard to threats to take life and walking in the highway. He was then asked to assume other facts that were in evidence, such as his 24 year marriage, his drinking, his extra-marital affairs, his work performance, the absence of any psychiatric treatment, his good health, and the facts shown in connection with his crossing Hempstead Highway. Objection was made to any expression of opinion on the grounds that some facts proven were not included in the question and because the witness would be invading the province of the jury and the subject of whether he committed suicide is not subject to expert testimony. The objection was overruled. The witness answered it was his opinion there was no plan to commit suicide, but the character of the deceased evidenced by the facts shown is of a person who seldom commits suicide. Such persons make threats but they are looking for sympathy and attention. Then the witness was asked to assume additionally the truth of Rita Romans' statement about his threats and his walking in the highway. The witness gave the same opinion. On cross-examination he stated the action of deceased as he was crossing the highway was that of a stumbling drunk who did not know what he was doing.

■ In appraising the asserted point of error, we must additionally notice that appellant, over appellee's objection, had introduced in evidence the death certificate. This certificate, signed by the Medical Examiner for Harris County, showed death was the result of suicide. While appellee contends it was not admissible, it suffices to say that it is made admissible as prima facie evidence of all facts stated by Article 4477, Rule 54a, Vernon's Ann.Tex.St. The result

of appellant's action is that it had introduced opinion evidence from a physician as to whether under the facts deceased committed suicide. We think appellee should have been permitted, under such circumstances, to refute the prima facie case of suicide made by this expression of opinion by the introduction of the same character of testimony. See Marker v. Prudential Insurance Co. of America, 273 F.2d 258, 5th Cir.

■ Appellant next complains of various portions of argument by counsel for appellee. The argument first complained of is that which appellant denominated "Comment on resources of defendants." Under this it complains of the argument where counsel stated in opening argument the defendant with all of its resources had been unable to find one instance where deceased had tried to commit suicide. In the closing argument it was stated Wilson, the bus driver, was a silent witness and all members of the jury knew defendant with all its resources could have had him present or explained his absence. When objection was made to the arguments the court sustained the objections and instructed the jury not to consider them.

The argument in neither instance was of such a nature as to appeal to prejudice and to contrast the wealth of appellant and appellee. Certainly it is of a nature that any harmful effect could be removed by instruction. Such instruction was given.

■ The next argument is classified as "Appeal to prejudice and sympathy." From the opening argument is this statement:

"Now, this obligation (to take care of his wife) he (the deceased) couldn't enforce about two and a half years ago, and it passed into my hands to see that it was done. I have carried it for two and a half years and I haven't carried it well at times. I realize that. I have done all that I can do for her. I am passing the obligation to you now. She is in your hands.

"Mr. Gresham wants you to put aside your emotions, be as cold hearted as he is about this thing. Let me say to you this. I want you to use your reason too. When you read these statements you tell us if that is reasonable or not. But I don't think you need to be afraid of your emotions when it is the right emotion, and you know what I am talking about. The bus driver was crying after he killed this man. I am not castigating him for it but I dare say Mr. Gresham is not going to tell you or criticize that emotion at that time. If it is the right emotion you know deep down in your heart whether it is the right thing to do or whether it isn't in this case. This is your conscience talking to you, and I say to you you can follow your conscience. She has been the victim of two designing women. She has been the victim of an unfortunate accident, and God help her if she now becomes the victim of these insurance companies."

On objection the court sustained it and instructed the jury not to consider it. The argument was not of a nature that its harmful effect could not be removed.

■ The closing argument under this label that is complained of is as follows:

"I think it will be a sad day of the insurance business of Texas or any other country when it comes to the point that the investigators of the insurance companies will beat the unfortunate widow to the morgue where the mangled body is * * *.

"Where is the conspiracy when two people unite in an unlawful enterprise to effect an unlawful purpose. What else can you call it but a conspiracy between these two women to get away from the wife of the altar * * * Who did she (meaning Rita Romans) phone after that drunken orgy? She phoned Evelyn Spillman * * * But you cannot reach any other conclusion that Evelyn (meaning the witness Evelyn Spillman) whatever her motive was was working with this Rita Romans in order to effect their unlawful relations * * *.

"McLaughlin (the deceased) made a terrible mistake. He had a weakness about him that he couldn't overcome the temptation and he yielded to it. But when you tell me that W. L. McLaughlin was all bad and there was no good in him, you are just saying something that I do not agree with. It seems to me like these four insurance companies after having carried these policies and taken his money as long as they did were almost in a position of defaming the name unnecessarily of W. L. McLaughlin * * *."

No objection was made to any of this argument except the last paragraph. On objection to it, the jury was instructed not to consider it. The argument again was of a nature that an instruction would remove its harmful effect.

The judgment of the Trial Court is affirmed.