227 N.J. Super. 175 (1988)
545 A.2d 1350
ANNA GAIDO, ADMINISTRATRIX AD PROSEQUENDUM AND GENERAL ADMINISTRATRIX OF THE ESTATE OF PETER GAIDO, PLAINTIFF-APPELLANT,
v.
SHELDON WEISER, DEFENDANT-RESPONDENT, AND ST. MARY'S HOSPITAL, CARRIER FOUNDATION, PETER BRYAN-BROWN, JAN KURDWANOWSKI AND MICHAEL BRAND, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued March 15, 1988.
Decided June 29, 1988.
*177 Before Judges MICHELS, SHEBELL and A.M. STEIN.
Zane Bouregy argued the cause for appellant.
Milton Gurny argued the cause for respondent (Hein, Smith & Berezin, attorneys; Milton Gurny, of counsel; Milton Gurny and Harold S. Berezin, on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
*178 Plaintiff Anna Gaido, Administratrix ad Prosequendum and General Administratrix of the Estate of Peter Gaido, appeals from a judgment of the Law Division entered in favor of defendant Sheldon Weiser (Dr. Weiser) on a molded jury verdict of no cause for action and from a denial of her motion for a new trial in this medical malpractice wrongful death action.
The facts giving rise to this appeal may be summarized as follows: in or about April 1965 decedent Peter Gaido, who resided with his plaintiff wife in Lodi, New Jersey, suffered a severe bout of depression which eventually led to his hospitalization in June of that year. During his stay at Hackensack Hospital, decedent attempted to commit suicide by cutting his wrists. As a result of this incident, decedent received regular psychiatric counseling for approximately one year and was placed upon anti-depressant medication. Although decedent stopped meeting with his psychiatrist in 1969, he continued taking the anti-depressant medication on a low dosage maintenance program.
In September 1981, decedent began experiencing numbness and tingling in his extremities. After these symptoms continued to worsen, decedent was examined by defendant Dr. Michael Brand, a neurologist, and placed in defendant St. Mary's Hospital in Passaic, New Jersey for evaluation. Although Dr. Brand diagnosed decedent's condition as multiple sclerosis, his neurological symptoms were greatly reduced as a result of treatment with the drug Prednisone.
Decedent returned from the hospital in early October 1981, and continued to make noticeable improvement. Around Christmas of that year, however, decedent began to express fears that his condition was worsening and became increasingly anxietal over his inability to support his family because he could not yet return to work. By January 1, 1982, decedent's depression was so severe that he repeatedly asked to be hospitalized "because he was afraid he was going to hurt himself." *179 Accordingly, plaintiff placed him in the psychiatric unit at St. Mary's Hospital under the care of defendant Dr. Jan Kurdwanowski, a psychiatrist. While hospitalized, decedent attempted to commit suicide on January 9, 1982, by lacerating his wrists with a broken light bulb. Consequently, he was transferred on January 14th to defendant Carrier Foundation (Carrier) in Belle Meade, New Jersey for more extensive psychiatric therapy.
At Carrier, decedent was placed under the care of defendant Dr. Peter Bryan-Brown, a psychiatrist. After taking an extensive personal history of decedent, Dr. Bryan-Brown placed him in the institution's "closed unit" due to his suicidal ideations. Dr. Bryan-Brown diagnosed decedent as having a "major recurrent depressive disorder", which meant that he might attempt to commit suicide again sometime in the future. Thereafter, a plan of treatment was implemented which included the daily administering of Ludiomil, an anti-depressant medication, as well as individual and group psychotherapy. As a result of this treatment, decedent's mood improved significantly and he was transferred to the open unit of Carrier on January 30, 1982.
On February 5, 1982, decedent was discharged from Carrier and given a prescription for Ludiomil and a sedative, Dalmane. Although Dr. Bryan-Brown considered suicidal risk to be minimal at this time and believed that decedent's prognosis was good, he nevertheless conditioned his discharge upon follow-up psychiatric treatment. Accordingly, plaintiff contacted defendant Dr. Sheldon Weiser on February 2, 1982 and the parties agreed to arrange an appointment once decedent was discharged.
On February 5, 1982, plaintiff called Dr. Weiser after her husband had returned from Carrier and an appointment was scheduled for February 11, 1982. Although decedent seemed fine during the day, he awoke during the night despite having taken a sedative and could not fall back to sleep, a trait which he had exhibited prior to entering the hospital. When plaintiff *180 called Dr. Weiser about this occurrence the following day, he attributed it to the anxiety of returning home. On February 6, 1982, decedent awoke in the middle of the night, however, and expressed to his wife the familiar concern of not being able to return to work. A similar situation occurred again on the following night of February 7, as decedent appeared to be regressing into an anxietal state over his health and financial ability.
The fact that these warning signs were returning in spite of decedent's regimen of medication compelled plaintiff to call Dr. Weiser on Monday morning, February 8, 1982, and ask that he see her husband that day. Dr. Weiser, however, assured plaintiff that her husband would be fine and that in any event he did not have any free appointments for that day. Although Dr. Weiser asked plaintiff whether decedent was "taking the medication" and apparently based his decision upon that fact, he later conceded at trial that he had no idea what medication was prescribed at Carrier, nor had he requested any information or records from the hospital or Dr. Bryan-Brown.
After a relatively uneventful Monday, decedent again woke up and engaged his wife in the same repetitive conversation regarding work and his physical well-being; this time even longer than before. Although the couple eventually fell back to sleep, plaintiff was awakened Tuesday morning at 6:00 a.m. by her daughter, Lisa, who told her that decedent was lying on the dining room floor and would not wake up. When plaintiff walked into the dining room, she observed a bottle of liquor on the table and was shocked to find her husband lying there in an alcoholic stupor. Eventually, she was able to rouse decedent and accompany him into the bathroom where he was sick for some time. When plaintiff asked him why he had done this, "[h]is reply was that he felt so bad when he woke up that he thought that if he had a drink, it would make him feel better."
This incident was particularly alarming to plaintiff because her husband rarely consumed more than one or two drinks per *181 year. After putting decedent to bed, plaintiff called Dr. Weiser and informed him of this extremely uncharacteristic behavior and again requested that he see the decedent that day. Dr. Weiser replied that he did not have any open appointment time and that in any event the decedent "probably [would not] drink again since he was not a drinker." Despite plaintiff's insistence that her husband needed immediate psychiatric attention, Dr. Weiser agreed to prescribe something "to take the edge off of things" and instructed her druggist to fill a prescription for a tranquilizer known as Tranxene. This, he advised her, would be safe to take in conjunction with the anti-depressant Ludiomil.
Plaintiff gave her husband Tranxene two times that day as per the prescription and he rested in bed for the remainder of February 9, 1982. Although decedent did not awaken during the night, plaintiff rose at 5:00 a.m. only to find that he had inexplicably left the house and had taken the car without leaving a note as to his whereabouts. When decedent returned home at 7:00 a.m. and plaintiff angrily expressed her concern over his sudden disappearance, he calmly responded that he was just riding around and had stopped for breakfast in order to think things over. Plaintiff called Dr. Weiser and expressed great concern over her husband's erratic behavior and implored him to see decedent that day. However, once again Dr. Weiser stated that no appointments were available for February 10 and that decedent would be all right until he saw him the next day at his scheduled appointment. Plaintiff accepted these assurances as she had in the past.
That afternoon, plaintiff accompanied her husband to the office of Dr. Brand for a neurological examination. During the course of this examination, decedent did not impress the doctor as being suicidal, leading him to conclude in his records, "Depression is under control." Dr. Brand's diagnosis revealed that decedent's affliction was in remission and he advised decedent that he would be able to return to work. Although decedent agreed that this was good news, he continued to express severe doubts about his physical condition on the ride home.
*182 After dinner that evening, decedent advised plaintiff that he was going out to a nearby department store. He never returned. At approximately 4:00 p.m. the following day, February 11, 1982, Sergeant Dennis Barry of the Ridgefield Park Police Department located decedent's body lying along the riverbank of Over Peck Creek, a tidal branch of the Hackensack River in Ridgefield Park, New Jersey. A bottle of Johnny Walker whiskey partially filled with river water was lying nearby. A subsequent toxicological analysis of the body revealed an alcohol level of .252% found in the brain tissue and .23% in the blood. Dr. Marlene Lengner, the Bergen County Medical Examiner, performed an autopsy of the body on February 12, 1982. Due to the large amount of water found in decedent's stomach, Dr. Lengner concluded that the decedent had drowned as indicated in the death certificate. Under the section captioned "Cause of Death" on the certificate, Dr. Lengner checked off the box marked "Accident."
Plaintiff instituted this medical malpractice wrongful death action against Dr. Weiser, St. Mary's Hospital, Carrier, Dr. Bryan-Brown, Dr. Kurdwanowski and Dr. Brand. She charged that Dr. Weiser deviated from accepted standards of medical care by negligently refusing to provide treatment and diagnosis of decedent and negligently prescribing the drug Tranxene, thereby proximately causing decedent's death. Plaintiff also charged that Dr. Bryan-Brown and Carrier were negligent in failing to arrange or provide proper follow-up psychiatric care for decedent after his discharge from Carrier. Plaintiff voluntarily dismissed the action against St. Mary's Hospital, Dr. Kurdwanowski and Dr. Brand prior to trial. The case went to trial against Dr. Weiser, Dr. Bryan-Brown and Carrier. At the conclusion of the proofs the jury found that Dr. Bryan-Brown and Carrier were not negligent. The jury, however, found that Dr. Weiser was negligent, but that his negligence was not a proximate cause of decedent's death. The trial court thereupon molded the jury verdict in favor of defendants for no cause for *183 action. Plaintiff's motion for a new trial with respect to Dr. Weiser was denied and this appeal followed.
We have carefully considered the record in light of the arguments presented and are satisfied that the evidence in support of the jury verdict is not insufficient, that the determination of the trial court and the motion for a new trial does not constitute a manifest denial of justice and that all issues of law raised are clearly without merit. R. 2:11-3(e)(1)(B), (C) and (E). However, further comment is necessary with respect to some of plaintiff's contentions.

I.
First, plaintiff contends that the following preliminary instructions of the trial court were incorrect and prejudicial:
... you'll be given a verdict form or special questions to answer, that's how you'll announce your verdict. The first question probably on the form may very well be "Did Mr. Gaido commit suicide?" Because from what I'm told that's an issue in the case and depending on how you answer that question, you would go on to decide whether any defendant was negligent. (Emphasis added).
Plaintiff's counsel did not immediately object to this remark. Rather, following the lunch recess, he went directly into his opening statement and posed the following issue to the jury:

Now, when you are called upon to deal with the question of accident or suicide, the defense argues accident; they say A: He just fell in the river. You will of course consider the  you will, of course consider the physical circumstances to the extent that the evidence is presented to you, consider this place and what business Mr. Gaido had there; this dirty, filthy river edge. This place that no one would go unless they had a dark purpose. You will consider the fact that Mr. Gaido had almost just about four weeks to the day before he was found in that river, cut himself in a suicide attempt four weeks earlier, that he had suicidal feelings while in the hospital for some time at the beginning of his treatment in Carrier or a sense of hopelessness and all, that he got a little better and went up and down and finally got out of the psychiatric hospital six days before  six or seven days before his body was found and you will not be asked to reach a conclusion to a scientific certainty like they do in laboratories where if you have one out of a hundred, that doesn't square up then you can't call that proof, that's not the standard of proof and Judge O'Halloran has told you that you're not even going to have to reach that conclusion or decide this question even beyond a reasonable doubt like the *184 standard is in criminal court but you're going to have to deal with probabilities; what's most likely, what's most probable? (Emphasis added).
* * * * * * * *
You'll hear the testimony of Dr. Whittington and he'll tell you his professional opinion, his professional  he's a psychiatrist, the overwhelming probability that Mr. Gaido committed suicide, not that he had an accident in a filthy place where he had no business, walked around with booze in him and fell in the river, a place where he had no reason for being. You'll hear my comments and the testimony about that. It's purely a question of what's most likely. (Emphasis added).
At the commencement of the next day of trial, however, plaintiff asked the trial court to correct its statement concerning suicide after her expert witness, Dr. Horace Whittington, testified. Plaintiff reasoned that her cause of action encompassed more than a claim that the doctors' negligent conduct proximately caused decedent to commit suicide. Alternatively, plaintiff argued that the pleadings and expert report submitted by Dr. Whittington supported the proposition that decedent's untreated depression significantly impaired his judgment and caused him to act with reckless indifference to the consequences. Thus, contrary to the preliminary comments by the trial court, plaintiff argued that she would not have to prove that decedent purposefully took his own life in order to establish proximate cause under this theory of liability.
Dr. Whittington testified that decedent "committed suicide, that he purposefully drowned himself." Although his report refers to the death of decedent as "self-induced", Dr. Whittington also testified that individuals suffering from profound depression are likely to expose themselves to danger and risks they normally would not take. Thus, while an ensuing death may bear all of the characteristics of a traditional accident, a "psychological autopsy" of the victim's likely state of mind at the time of his demise may reveal a deliberate intention to "get in harm's way." Therefore, Dr. Whittington was also of the opinion that decedent's judgment was so impaired at the time that he intentionally exposed himself to the risk of death by *185 drinking an excessive quantity of alcohol near a "rather remote, dangerous area."
Prior to Dr. Whittington's testimony, defendants' counsel objected that his theory of causation based upon "impaired judgment" went beyond the scope of the expert report. The trial court disagreed, finding the pleadings as well as the written report to be consistent with plaintiff's claim that decedent's death was caused by his untreated mental condition, whether or not he had formed a specific intent to commit suicide. However, the trial court denied plaintiff's request to retract the preliminary comment regarding suicide at this time because it "want[ed] to hear all the evidence before [giving] any instruction along those lines to the jury."
Despite plaintiff's further request that an amendatory instruction be given before the testimony of Dr. Lengner, who was subpoenaed by plaintiff's counsel to testify as to why she checked off "Accident" on the death certificate, the trial court did not do so until the end of plaintiff's case-in-chief, at which point he instructed the jury as follows:
Ladies and gentlemen, before we continue with the evidence, I want to correct something that I said at the very start of the trial. When I was selecting the jury and I gave you a little thumb nail sketch of what this case was about, I may have said that it was claimed by the plaintiff that her husband committed suicide and when I was giving you my preliminary instructions after you eight had been selected, I told you that I was going to prepare a jury verdict form of questions and the form of your verdict would really be to answer some or all of those questions and I indicated to you that the first question on the form would probably be "Did Mr. Gaido commit suicide?" The implication from everything that I said to you there being that that was the only claim in the case. Well, I was mistaken and I had said that to you before I actually heard the evidence and testimony. Suicide of course is the deliberate or intentional self-destruction. The plaintiff's claim in this case is that her husband probably committed suicide but her claim goes beyond that, it's broader than that. It goes beyond that because she claims her husband died because of an impaired judgment due to his mental illness which she says had been negligently treated by the defendants or either of them. So her claim is broader than pure suicide, if there's such an expression.
Consistent with this instruction, the trial court did not make a legal distinction between death by suicide or accidental death in *186 its final charges to the jury. Rather, the trial court summarized plaintiff's case as follows:
... plaintiff contends that her husband's death was probably suicide but if not, she contends that the decedent died because of impaired judgment due to mental illness; his depression. In either event, she contends that his death was caused because his mental illness had been negligently cared for by the defendants or either of them.
Whatever misconception of plaintiff's theory of the case may have been created by the trial court's preliminary comment to the jury, it was more than adequately dispelled by the trial court's subsequent amendatory instructions. As we stated in Ardis v. Reed, 86 N.J. Super. 323, 333 (App.Div. 1965), aff'd o.b. 46 N.J. 1 (1965):
A charge must be considered as a whole. Stackenwalt v. Washburn, supra, 42 N.J. [15] at p. 26. When the court's charge, considered as a whole, presents the law fairly and clearly to the jury, there is no ground for reversing the judgment, though some of the expressions, when standing alone, might be regarded as erroneous.
See also Panas v. N.J. Natural Gas Co., 59 N.J. 255, 258-259 (1971); Lesniak by Lesniak v. Bergen County, 219 N.J. Super. 468, 472 (App.Div. 1987); Dorn v. Transport of New Jersey, 200 N.J. Super. 159, 166 (App.Div. 1984). Considering the charge as a whole, the jury was not misled into thinking that that the doctors and Carrier could not be found negligent unless decedent intentionally committed suicide.
Moreover, insofar as the trial court's preliminary comment on suicide may have been inconsistent with Dr. Whittington's `alternative' theory of impaired judgment due to mental disability, it is significant to note that plaintiff's counsel did not make immediate objection. To the contrary, he went directly into his opening statement and in fact characterized the issue as one of accident versus suicide. Additionally, even if corrective action was not taken until after the plaintiff's case, the trial court did not instruct the jury on any issues that were not argued or remove any claims that had been presented. See, e.g., Skupienski v. Maly, 27 N.J. 240 (1958); Guzzi v. Jersey Central Power & Light Co., 12 N.J. 251 (1953). The ultimate question put to the jury in the verdict sheet made no reference to *187 accident, suicide, or death as a result of impaired judgment; the question was simply whether the doctors and Carrier were negligent, and if so, whether such negligence constituted a proximate cause of decedent's death. As such, "the jury here was not left in any doubt as to which of the two conflicting statements correctly announced the rule to be followed." Panas, 59 N.J. at 259.
Consequently, we are satisfied that plaintiff's right to a fair trial was not prejudiced by the trial court's preliminary comments to the jury.

II.
We are satisfied that the trial court did not improperly allow Dr. Lengner, the Bergen County Medical Examiner who signed decedent's death certificate, to testify on cross-examination that had she known of decedent's past suicide attempts, her opinion that the death was an accident would not have changed.
Plaintiff subpoenaed Dr. Lengner, who performed the autopsy upon decedent, to testify as to why she had checked off "Accident" as the cause of death on the death certificate. This tactic apparently was employed by plaintiff to establish that at the time Dr. Lengner performed the autopsy, she had no knowledge of decedent's psychiatric problems, hospitalization or previous suicide attempts, a fact to which she readily conceded. Over plaintiff's objection, the trial court then permitted Dr. Lengner to respond to the following question put by Dr. Weiser's counsel on cross-examination:
Q. Dr. Lengner, if at the time you signed this death certificate, you had the information that was just supplied to you by Mr. Bouregy, Mr. Gaido's attorney regarding this past psychiatric history, would that have changed your opinion in any respect as to whether the death was due to accident or suicide?
A. No, it would not have.
Upon further cross-examination, Dr. Lengner stated that she believed that decedent's death was an accident rather than suicide because his body was found on the edge of a shallow *188 tidal creek and his glasses were lying within inches of his head. As such, she concluded that he had fallen a short distance and hit his head on the surrounding rocks. On redirect, the trial court allowed plaintiff's counsel to elicit the doctor's admission that she had not looked at specific medical records concerning decedent's psychiatric problems nor had she been made aware of the sutured lacerations on decedent's wrists before filling out the death certificate.
On appeal, plaintiff contends that Dr. Lengner was called solely as a "fact witness" in order to establish that she had no knowledge of decedent's psychiatric background or suicidal history. Therefore, she argues that it was improper for defendants to question the doctor about her "opinion" of suicide on cross-examination in view of the fact that she had not been named as an expert by them nor had a foundation been laid to establish that she was competent to render such an opinion. This argument is without merit for several reasons.
Primarily, there is no doubt that under Biro v. Prudential Ins. Co. of America, 57 N.J. 204 (1970), rev'g on dissent, 110 N.J. Super. 391, 402 (App.Div. 1970), defendants would not have been able to introduce decedent's death certificate into evidence unless the portion referring to "Accident" was excised, nor would they have been permitted to produce Dr. Lengner to testify to that effect. The reason underlying this rule is that while medical examiners are uniquely situated to draw conclusions as to physiological causes of death, i.e. "the decedent died by drowning", they are no more competent than the jury to decide from the evidence whether a death is accidental or suicide. Biro, 110 N.J. Super. at 403-405.
Here, however, unlike the situation in Biro, plaintiff subpoenaed and presented Dr. Lengner in her case-in-chief in order to establish the fact that she had rendered an opinion adverse to plaintiff's case without making any prior inquiry into decedent's psychiatric background. Once the conclusion of accident was adduced by plaintiff, it was well within the trial court's *189 discretion to allow defendants to cross-examine Dr. Lengner as to whether her opinion would have been different had she known of this information at the time the autopsy was performed. The law is well-established that "the scope of cross-examination is a matter for the control of the trial judge and that an appellate court will not interfere with such control unless clear error and prejudice is shown." Mazza v. Winters, 95 N.J. Super. 71, 78 (App.Div. 1967); Cestero v. Ferrara, 110 N.J. Super. 264, 273-274 (App.Div. 1970), aff'd 57 N.J. 497 (1971). See also Amaru v. Stratton, 209 N.J. Super. 1, 13 (App.Div. 1985). Such discretion was not mistakenly exercised in this case.
Finally, contrary to plaintiff's claim, the trial court did not commit error, let alone plain error, in admitting into evidence the death certificate executed by Dr. Lengner. Plaintiff called Dr. Lengner to establish that she had formed an opinion that decedent's death was accidental without inquiring into decedent's psychiatric background. Plaintiff referred to the death certificate and its contents on direct examination and Dr. Lengner was extensively cross-examined as to her opinion. Moreover, when the certificate was offered into evidence by Dr. Weiser, plaintiff did not object. Under these circumstances, the trial court's evidential ruling does not provide a valid basis for reversal of this judgment.

III.
Plaintiff also contends that the trial court erred in permitting Dr. Weiser's expert, Dr. N. Frank Riccioli, from testifying as to matters beyond the scope of his original written report. In his report, Dr. Riccioli, stated upon review of certain enumerated documents that:
It is my opinion that there was no direct causal relationship between Dr. Weiser's conduct and Mr. Gaido's death.
Dr. Riccioli opined that the scheduling of decedent's appointment on February 11, 1982 after his discharge on February 5 *190 was "not an unreasonably long waiting period for a first post-hospitalization appointment", and that there was "nothing to indicate a psychiatric emergency" after decedent was released. The essence of this report, however, concerned the allegation that Dr. Weiser had negligently prescribed the tranquilizer Tranxene without first examining decedent or recognizing that the drug should not be used by individuals who are under the influence of alcohol. Primarily, Dr. Riccioli concluded that since "[t]he toxicological report did not reveal the presence of Tranxene ... the deceased did not take the Tranxene prescribed by Dr. Weiser and thusly there is no causal relationship between the Tranxene and Mr. Gaido's death."
When Dr. Riccioli testified, however, Dr. Weiser's counsel posited a lengthy hypothetical question encompassing certain assumptions beginning from decedent's hospitalization in 1965 to his death, and then proceeded to ask the doctor whether in his opinion, "the care and treatment rendered by Dr. Weiser or any failure on the part of Dr. Weiser in rendering treatment was a proximate cause of Mr. Gaido's death?" Plaintiff's counsel objected on the ground that the question went beyond the scope of the written report, namely that Dr. Weiser's prescription of Tranxene could not have proximately caused decedent's death because no mention of the drug was made in the toxicological report. Plaintiff's counsel further advised the trial court that he had relied upon this report in preparing a limited cross-examination which went only so far as to demonstrate that Tranxene was not mentioned in the toxicological report because no one had tested for it.
In order to determine an appropriate course of action, the trial court requested Dr. Riccioli to give his proposed response outside the presence of the jury. In sum, Dr. Riccioli testified that even assuming decedent committed suicide, Dr. Weiser could not have predicted such behavior or prevented him from taking his own life once he had made up his mind to do so. Based upon this answer, the trial court overruled plaintiff's objection, but allowed counsel to take Dr. Riccioli's deposition *191 that night, at Dr. Weiser's expense, before the testimony continued. The trial court then directed that a written transcript of this testimony be prepared to serve as the supplemental expert report.
The following day, Dr. Riccioli testified based on the contents of the supplemental report. In support of his opinion that Dr. Weiser could not have altered or predicted decedent's death even if the drowning were a suicide, Dr. Riccioli cited the fact that decedent:
was a non-drinker and at the time of the drowning he had high quantities of alcohol, he had one episode of drinking at home in which he became acutely intoxicated but more than that, he became very sick, he was throwing up, was found lying on the floor and told his wife he wouldn't do it again so had the doctor seen him, there's no reason for the doctor not to believe that he would have gone out and gotten drunk again especially since he's a non-drinker so in that respect, I don't think that the doctor could have changed his behavior if he still were anxious and up tight and nervous, he would have gone out and gotten drunk again.
* * * * * * * *
As far as the suicide is concerned, predicting human behavior, future human behavior is very difficult and I don't feel that the doctor could have in any way have predicted that Mr. Gaido would have committed suicide.
In arriving at this conclusion, Dr. Riccioli found the decedent's visit to Dr. Brand on February 10, 1982, to be significant:
[b]ecause when Dr. Brand had seen him, he had done his brief mental status examination and found no changes in his mood or his emotions. Had he continued with that presentation to Dr. Weiser even with a lengthy examination, if the man was feeling better, the doctor wouldn't have picked it up. If he were determined to commit suicide, if he felt that he was going to commit suicide, then he would have masked his emotions. When a person has made up his mind to commit suicide, they tend to follow through with it if they can assuming it were a suicide but we know that it's death by drowning.
On appeal, plaintiff contends that this testimony should not have been admitted because (1) the scope of the new report was completely beyond the limited subject of the original report as it pertained to the prescription of Tranxene, (2) any general statements in his original report which might be referable to the content of his testimony ("i.e. there was no direct causal relationship between Dr. Weiser's conduct and Mr. Gaido's death") were nothing more than net opinions and (3) the overall *192 effect of such testimony was misleading and prejudicial, particularly in view of the fact that plaintiff's counsel was not advised of this new opinion when he announced to the jury during opening statements that Dr. Riccioli's testimony would be limited to decedent's ingestion of Tranxene and not to Dr. Wieser's conduct. Although Dr. Riccioli's supplemental report may have been beyond the scope of his original report, the trial court's decision to allow this testimony, following an adjournment and deposition of the doctor, did not constitute an abuse of discretion. On the contrary, it was a sound and effective way to solve a problem of this nature.
It is evident that parties are obligated under R. 4:17-4(a) and (e) to furnish expert's reports requested through interrogatories on a continual basis, and that the trial court may exclude expert testimony which does not fall within the scope of the requested report. R. 4:23-5(b). However, as we declared in Westphal v. Guarino, 163 N.J. Super. 139, 145-146 (App.Div. 1978), aff'd o.b. 78 N.J. 308 (1978):
... the application of the sanction [of excluding expert testimony] is consigned to the sound discretion of the judge, subject only to the rule that the sanction visited upon the party must be just and reasonable. [citation omitted]. The factors which would "strongly urge" the trial judge, in the exercise of his discretion, to suspend the imposition of sanctions, are (1) the absence of a design to mislead, (2) absence of the element of surprise if the evidence is admitted, and (3) absence of prejudice which would result from the admission of the evidence.
Accord Amaru, supra, 209 N.J. Super. at 11; Skibinski v. Smith, 206 N.J. Super. 349, 355 (App.Div. 1985). Bearing in mind the principle that "the sins or faults of an errant attorney should not [generally] be visited upon his client", Wilkins v. Hudson County Jail, 217 N.J. Super. 39, 41 (App.Div. 1987), certif. den. 109 N.J. 520 (1987), quoting Jansson v. Fairleigh Dickinson University, 198 N.J. Super. 190, 194 (App.Div. 1985), the courts have been reluctant to impose the sanction of testimonial exclusion where a litigant's attorney has failed to comply fully with the rules of discovery. Wilkins, 217 N.J. Super. *193 at 41-42; Maurio v. Mereck Construction Co., Inc., 162 N.J. Super. 566, 570 (App.Div. 1978).
Although Dr. Riccioli's report was essentially predicated upon the absence of Tranxene in the toxicological report, it also contained an opinion that no causal relationship existed between Dr. Weiser's conduct and decedent's death and that there was "nothing to indicate a psychiatric emergency" after defendant was released. This was a critical issue in this case. Thus, even if these statements amounted to nothing more than "net opinion", it was well within the trial court's discretion to determine their factual underpinnings outside the jury's presence and grant an adjournment for the doctor's deposition. Notwithstanding the fact that plaintiff's counsel may have relied upon the original report in formulating a limited cross-examination of Dr. Riccioli based on his knowledge of the forensic tests, the doctor's trial testimony did not pose a danger of surprise or prejudice to plaintiff's case. Plaintiff's case was predicated from the outset on the claim that Dr. Weiser's failure to treat decedent was a proximate cause of his death. Dr. Riccioli's supplemental report did not attempt to introduce any unrelated issue or new line of defense; it simply sought to expand upon the already familiar theory that Dr. Weiser could not have foreseen the consequences of refusing to see decedent until the date of the scheduled appointment. Therefore, as in Amaru, Skibinski, and Wilkins, plaintiff was or should have been fully prepared to deal with Dr. Riccioli's opinion on this issue.
Finally, plaintiff's claim that Dr. Riccioli committed perjury when he testified during direct examination is completely without merit in view of the simple fact that the question asked on direct examination, namely, whether Dr. Weiser's conduct was a proximate cause of decedent's death, required the doctor to draw a conclusion from the established fact that Dr. Weiser refused to see decedent before his scheduled appointment. Contrarily, the questions which plaintiff's counsel posed to Dr. Riccioli during the earlier deposition required him to speculate as to whether the decedent would have committed suicide at *194 some undetermined point in the future even if he had received proper psychiatric care. Without broaching the subject of whether a medical expert can commit perjury by giving an opinion under oath which is allegedly inconsistent with prior testimony, it is clear that the questions at issue here are dissimilar and do not even inferentially support a finding that Dr. Riccioli made a material affirmation under oath in the course of a proceeding which he knew to be false. See State v. Boratto, 80 N.J. 506, 515 (1979). At most, any apparent contradictions between the doctor's opinion given at trial and his prior responses during deposition are a matter of credibility for the jury's consideration. See Evid.R. 20.

IV.
Plaintiff further contends that the jury finding of no proximate cause between Dr. Weiser's negligence and decedent's death was against the weight of the evidence and that therefore, the trial court erred in denying her motion for a new trial. We disagree. The trial court's disposition of a new trial motion based on weight of the evidence will not be overturned "unless it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1. As the Supreme Court pointed out in Carrino v. Novotny, 78 N.J. 355, 360 (1979):
... a jury verdict, from the weight of the evidence standpoint, is impregnable unless so distorted and wrong, in the objective and articulated view of a judge, as to manifest with utmost certainty a plain miscarriage of justice.
See also Baxter v. Fairmont Food Co., 74 N.J. 588, 597-598 (1977); Wytupeck v. Camden, 25 N.J. 450, 466 (1957). In reviewing a trial court's action on a motion for a new trial following a jury verdict, we must weigh heavily the trial court's "views of credibility of witnesses, their demeanor, and [its] general `feel of the case'...." State v. Sims, 65 N.J. 359, 373 (1974). See also Dolson v. Anastasia, 55 N.J. 2, 6-7 (1969).
Here, after the jury returned a verdict finding Dr. Weiser to be negligent but not to have proximately caused decedent's *195 death, plaintiff moved for a new trial. The trial court denied the motion, reasoning, in part, as follows:
Here, the jury could reasonably have concluded from a wealth of evidence in the record that Mr. Gaido committed suicide and although Dr. Weiser was negligent, his negligence was not the proximate cause of Mr. Gaido's suicide. As defense counsel argued to the jury in summation, the decedent had already twice in his life attempted suicide even though he was at the time being treated by psychiatrists in a protected atmosphere of a hospital. The jury could have accepted the common sense argument that there simply is no way of preventing suicide once a person has made a decision. Of course, there were reasonable and plausible arguments that could lead a jury to an opposite conclusion but it certainly could not be said that it was a plain miscarriage of justice for the jurors to have concluded that the plaintiff simply did not prove by a preponderance of the credible evidence that defendant Dr. Weiser's negligence was a proximate cause of her husband's death.
Notwithstanding the undisputed fact that (a) plaintiff had called Dr. Weiser on several occasions regarding her husband's aberrant behavior, (b) Dr. Weiser refused to see decedent before his scheduled appointment and (c) Dr. Weiser never called Dr. Bryan-Brown or Dr. Kurdwanowski for decedent's medical records and prescribed Tranxene for him without first making a physical examination, it was clearly within the jury's province to rationally conclude that Dr. Weiser's negligent conduct did not constitute a proximate cause of decedent's death.
As stated by the Supreme Court in Fernandez v. Baruch, et al., 52 N.J. 127, 132 (1968), "[t]he controlling factor in determining whether there may be a recovery for failure to prevent a suicide is whether the defendants reasonably should have anticipated the danger that the deceased would attempt to harm himself." Moreover, as we recently noted in Cowan v. Doering, 215 N.J. Super. 484, 494-495 (App.Div. 1987), certif. granted 107 N.J. 634 (1987):
Where it is reasonably foreseeable that a patient by reason of his mental or emotional illness may attempt to injure himself, those in charge of his care owe a duty to safeguard him from his self-damaging potential. This duty contemplates the reasonably foreseeable occurrence of self-inflicted injury regardless of whether it is the product of the patient's volitional or negligent act.
The question of foreseeability and proximate causation in this context, however, relates directly to the degree of control and *196 responsibility which the doctor has assumed over the patient at the time the suicide is attempted. As the California Court of Appeals stated in Bellah v. Greenson, 81 Cal. App.3d 614, 620, 146 Cal. Rptr. 535, 538, 17 A.L.R.4th 1118, 1122 (1978), "[o]bviously, the duty imposed upon those responsible for the care of a patient in an institutional setting differs from that which may be involved in the case of a psychiatrist treating patients on an out-patient basis."
Plaintiff's reliance upon Cowan v. Doering for the proposition that "reasonable minds cannot differ in reaching the conclusion that Dr. Weiser's neglect of Peter Gaido was a substantial factor in his death" is misplaced. In Cowan, where the plaintiff sustained injuries after jumping out of a second story hospital window while she was under a "suicide watch", the question before the court was whether the trial judge had properly refused to submit the issue of contributory negligence to the jury. In affirming this decision, we reasoned that:

[p]laintiff's self-destructive propensities were plainly part and parcel of the mental illness from which she suffered. A triable factual question was not presented in that regard. We are convinced that on the record before us reasonable minds could not differ in evaluating plaintiff's conduct. [Cowan, 215 N.J. Super. at 496. (Emphasis added)].
In this case, however, the question of whether defendant's conduct constituted a proximate cause of decedent's death was clearly one for the jury. Rappaport v. Nichols, 31 N.J. 188, 203 (1959); Martin v. Bengue, Inc., 25 N.J. 359, 374 (1957); Vadurro v. Yellow Cab Co. of Camden, 6 N.J. 102, 108 (1950). There was more than ample evidence from which the jury could conclude that Dr. Weiser's refusal to see decedent before his scheduled appointment did not constitute a proximate cause of his death, particularly in view of the fact that (1) decedent's death was not conclusively determined to be self-induced, (2) decedent showed no manifest suicidal tendencies on the days preceding his death despite his aberrational behavior, (3) decedent had previously attempted suicide with no apparent forewarning even while under psychiatric hospital care, and (4) Dr. Riccioli testified that assuming decedent committed suicide, Dr. *197 Weiser could not have predicted such behavior or prevented decedent from taking his own life once he made up his mind to do so. That the jury might have concluded otherwise in view of Dr. Whittington's testimony regarding the critical need for prompt follow-up psychiatric care of a suicidal patient who has just been discharged does not constitute a valid ground to overturn the verdict. If competent evidence supports the jury's verdict, as was the case here, we cannot properly disturb that verdict. McDonald v. Mianecki, 159 N.J. Super. 1, 25 (App.Div. 1978), aff'd 79 N.J. 275 (1979); Barber v. Vaccaro, 32 N.J. Super. 573, 577-578 (App.Div. 1954), certif. den. 17 N.J. 523 (1955). Stated simply, based on a careful review of the record, we are convinced that the jury verdict was not a miscarriage of justice under the law.

V.
Finally, plaintiff contends that the trial court's charge with respect to proximate cause was misleading and that it erred in failing to reinstruct the jury on that issue when the jury requested that the instruction be reread. The trial court instructed the jury with respect to proximate cause, in pertinent part, as follows:
"A proximate cause" means that the negligent conduct was an efficient cause of his death, that is a cause which necessarily set the other causes in motion and was a substantial factor in bringing about his death. "A proximate cause" is any cause which in a natural and continuous sequence produces the result complained of. Without which, the result would not have occurred. To be "A proximate cause" the negligence of a defendant need not be the only cause of Mr. Gaido's death, there can be other causes as well but to be "A proximate cause" the negligence must be at least a substantial factor in bringing about or causing that result.
After the jury retired for deliberations, it requested a copy of the trial court's definition of proximate cause. When the trial court reviewed the contents of the charge with counsel, plaintiff requested that the charge be modified to conform with the applicable provision of the Model Jury Charges. The trial court denied this application and reread the initial instruction on *198 proximate cause because the jury had not asked that the charge be clarified in any way.
On appeal, plaintiff contends that the portion of the charge referring to proximate cause as "any cause which in a natural and continuous sequence produces the result complained of" was misleading and should have been stricken on the subsequent recharge because it prejudicially suggested "that Mr. Gaido's own conduct may have been an independent intervening cause interrupting this `continuous sequence'." This argument lacks merit for several reasons.
Preliminarily, it is evident that the objection to the charge was not raised until after the jury had already been in deliberation for an entire day and only then when the court reread the applicable passage to counsel before giving the requested reinstruction. As such, any alleged deficiencies concerning this charge were not raised in a timely fashion and should be disregarded on appeal unless they were clearly capable of producing an unjust result under the "plain error" standard set forth in R. 2:10-2. However, we cautioned in Nesta v. Meyer, 100 N.J. Super. 434, 446 (App.Div. 1968):
Relief under the plain error rule is to be sparingly granted. Ford v. Reichert, 23 N.J. 429, 435 (1957). The purpose of the rule requiring objection to the charge is to alert the trial judge to the asserted error and thus afford him an opportunity of correcting it before the jury retires to deliberate. Gluckauf v. Pine Lake Beach Club, Inc., 78 N.J. Super. 8, 18 (App.Div. 1963). Frequently, for reasons of trial strategy or otherwise, experienced counsel elects to overlook an omission or inadvertence on the part of the trial judge. In such case an inference of passive indifference, if not acquiescence, may be drawn. Cf. Priest v. Poleshuck, 15 N.J. 557, 564 (1954); Valls v. Paramus Bathing Beach, Inc., 46 N.J. Super. 353, 357 (App.Div. 1957). But counsel may not be permitted to overlook alleged error in the charge as given to gamble on a favorable verdict and, upon the coming in of an adverse one, seek a "second bite of the apple" on the basis of plain error. Cf. Lippman v. Ostrum, supra, 22 N.J. [14] at p. 26. [(Emphasis added)].
Moreover, in addition to the requirement that objection to instructions be raised before the jury retires to deliberate, it is also incumbent upon the party to apprise the trial court of the specific nature of his objection at that time. West v. MacDonald, *199 et al., 103 N.J. Super. 201, 213 (App.Div. 1967), aff'd o.b. 52 N.J. 536 (1968). Here, it is evident that while plaintiff's counsel's untimely request for a "clarification" was predicated upon the fact that the initial instruction on proximate cause was not a verbatim reading of the Model Jury Charge (See Section 7.11), he did not complain, as he does now on appeal, that the term "natural and continuous sequence" misleadingly suggested that decedent's own negligence could be considered a superseding, intervening cause.
Even if Model Jury Charge 7.11 does not employ the term "natural and continuous sequence" in its definition of proximate cause, it is difficult to perceive how the trial court's inclusion of this language could have misled the jurors into thinking that decedent's contributory negligence was an issue for their consideration, since defendants withdrew their requests to charge the jury on suicide as an intervening cause and the trial court did not attempt to raise the issue at any point in its instructions. Moreover, it is well-settled that:
as long as the law is stated correctly and intelligently, the ultimate test of the soundness of instructions to the jury is not what the ingenuity of counsel can, at leisure, work out the instructions to mean, but how and in what sense, under the evidence and the circumstances of the trial, ordinary jurors would understand the instructions as a whole. [Ellis v. Caprice, 96 N.J. Super. 539, 546 (App.Div. 1967), certif. den. 50 N.J. 409 (1967)].
See also Ardis v. Reed, supra, 86 N.J. Super. at 331-333.
Notwithstanding the inclusion of the term "continuous sequence", the body of the charge delivered by the trial court closely tracked the language of Model Jury Charge 7.11 and adequately conveyed the concept of proximate cause as it has been defined in our case law. In fact, the trial court's reference to proximate cause as a "natural and continuous sequence" was expressly adopted in Fernandez, supra, 96 N.J. Super. 125, 140 (App.Div. 1967), rev'd on other grounds, 52 N.J. 127 (1968) and in Polyard v. Terry, 160 N.J. Super. 497, 511 (App.Div. 1978), aff'd o.b. 79 N.J. 547 (1979). See also Battista v. Olson, 213 N.J. Super. 137, 148-149 (App.Div. 1986). Since the charge adequately covered the governing legal principles in *200 this case, plaintiff was not entitled to have the jury charged in words of her own choosing. Mohr v. B.F. Goodrich Rubber Co., 147 N.J. Super. 279, 283 (App.Div. 1977), certif. den. 74 N.J. 281 (1977); Ridgewood v. Sreel Investment Corp., 28 N.J. 121, 132 (1958).
Finally, we would not reverse the judgment as would our dissenting colleague simply because the trial court did not sua sponte instruct the jury that "plaintiff only had to show that there was a substantial possibility that decedent's death could have been avoided had proper psychiatric care been rendered" in order to visit liability upon Dr. Weiser. The dissent draws this conclusion from the discussion of the concept of proximate cause as applied in Hake v. Manchester Tp., 98 N.J. 302 (1984) and Battista v. Olson, supra. These cases stand generally for the proposition that in negligence actions predicated upon nonfeasance in lost chance of survival type situations it is for the jury to determine whether such nonfeasance was a "substantial factor contributing to the loss." Hake, 98 N.J. at 311 (quoting Francis v. United Jersey Bank, 87 N.J. 15, 44 (1981)). In Hake, the decedent was arrested for driving while intoxicated and placed in an unsupervised detention area adjacent to several jail cells. When the police returned to check on the decedent several hours later, he was found unconscious with a belt around his neck which had been secured to one of the cell doors. Instead of immediately releasing defendant from the belt and calling for an ambulance, the chief of police decided to leave him suspended until the prosecutor's office and their photo unit arrived. Similarly, in Battista, the intoxicated decedent died of respiratory arrest while in the hands of several police officers who neglected to call an ambulance or transport him to the hospital. In recognizing that "[t]ort claims based on `lost chance' in terms of causation of ultimate injury present unique conceptual and analytical problems not presented in other more typical negligence cases," Hake, 98 N.J. at 309; Battista, 213 N.J. Super. at 150, the plaintiffs were required only to prove with respect to the issue of causation that there *201 was a substantial possibility of survival or rescue if prompt emergency measures had been taken.
However, this case was tried on an entirely different theory than that advanced in Hake and Battista. We cannot conclude that the existence of a causal relationship with decedent's death was implicit in Dr. Weiser's breach of duty. Plaintiff did not try this case on a "lost chance" theory. She did not request a charge with respect to proximate cause in terms of "substantial possibility." In fact, plaintiff did not even raise this argument on appeal as a ground for reversal. A careful reading of the record shows that plaintiff opened to the jury on the theory that Dr. Weiser's negligence was a "substantial factor" or a "substantial factoring cause" in or leading to the death of decedent. Dr. Whittington, plaintiff's expert, supported this theory and testified that Dr. Weiser's negligence "was a substantial factor or proximate cause of Mr. Gaido's death." The trial court accordingly instructed the jury with respect to proximate cause in terms that Dr. Weiser's negligence must be "a substantial factor in bringing about or causing" decedent's death. To now reverse this judgment because the trial court on its own did not define proximate cause in terms of "substantial possibility" would be not only contrary to accepted legal principles governing this case, but would also offend fundamentally sound principles of appellate review and would be "manifestly unfair to the defendant ... to say nothing of the trial judge." Rochinsky v. State, 110 N.J. 399, 431 (1988) (Clifford, J., dissenting).
Thus, contrary to the view of our dissenting colleague, we are thoroughly convinced that the charge was not "inadequate and erroneous and that its shortcomings resulted in a miscarriage of justice." The charge, read as a whole, presented the principle of proximate cause governing this case fairly and accurately and could not reasonably have confused or misled the jury. Certainly, the charge was not clearly capable of producing an unjust result.

*202 VI.
Accordingly, the judgment and order denying plaintiff's motion for a new trial under review are affirmed.
SHEBELL, J.A.D., dissenting.
I part company with my colleagues only on the issue of the propriety of the trial court's charge with respect to proximate cause. I am convinced that it was inadequate and erroneous and that its shortcomings resulted in a miscarriage of justice. Clearly the deficiencies in the jury instruction on proximate cause rise to the level of plain error. R. 1:7-2; R. 2:10-2.
We must assume that the jury finding that defendant Dr. Weiser was negligent was based at least in part upon the doctor's deviation from accepted medical standards by refusing to provide treatment for decedent. This aspect of plaintiff's malpractice claim unquestionably was the most important and viable part of the malpractice claims that were made against the defendant-doctor. It was, therefore, necessary that the jury instruction be tailored to that factual and legal allegation so that the jury could understand the legal framework of the case and properly apply the law as it pertained to proximate cause. See Campos v. Firestone Tire & Rubber Co., 98 N.J. 198, 210-11 (1984).
In my opinion, the proximate cause charge given by the trial judge was inappropriate and unworkable when applied to a malpractice theory of failure to treat and diagnose. The court's instruction that "a proximate cause" means
that the negligent conduct was an efficient cause of his death, that is a cause which necessarily set the other causes in motion and was a substantial factor in bringing about his death
together with the court's instruction that "a proximate cause"
is any cause which in a natural and continuous sequence produces the result complained of ... [w]ithout which, the result would not have occurred
conflicts with the "substantial factor" exception to the general rule of proximate causation. The court negates the "substantial factor" exception by its instruction that "the negligence *203 must be at least a substantial factor in bringing about or causing that result" in order to be a proximate cause. (Emphasis supplied).
As we noted through Judge Michels in Battista v. Olson, 213 N.J. Super. 137, 149 (App.Div. 1986), the "substantial factor" exception to the general rule of proximate causation is intended to temper the "natural and continuous sequence" rule of proximate cause. The negligence need only be a substantial factor contributing to the loss. Hake v. Manchester Tp., 98 N.J. 302, 311 (1985). This concept was not conveyed to the jury as the court appears to have admonished the jury that proximate cause required that "the negligence must be at least a substantial factor in bringing about or causing that result." (Emphasis supplied). I believe the average juror would be under the impression that this portion of the charge increased plaintiff's burden rather than tempered it.
More importantly, I believe that the vital concept established by the Supreme Court in Hake and the insight which it provides into the burden of proof on proximate cause in those cases involving the failure to treat has been overlooked by the majority here. As the Supreme Court noted in Hake, quoting Evers v. Dollinger, 95 N.J. 399, 417 (1984):
If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable. Rarely is it possible to demonstrate to an absolute certainty what would have happened in circumstances that the wrongdoer did not allow to come to pass. [98 N.J. at 310].
Thus, the Hake Court, alluding to the analogous example of the drowning seaman, concluded that
[c]ausation is proved if the master's omission destroys the reasonable possibility of rescue.... Therefore, proximate cause here is implicit in the breach of duty. Indeed, the duty would be empty if it did not itself embrace the loss as a consequence of its breach. Once the evidence sustains the reasonable possibility of rescue, ample or narrow, according to the circumstances, total disregard of the duty, refusal to make even a try, as was the case here, imposes liability. [Id. at 310-11, quoting Gardner v. National Bulk Carriers, Inc., 310 F.2d 284, 287 (4th Cir.1962), cert. den. 372 U.S. 913, 83 S.Ct. 728, 9 L.Ed.2d 721 (1963)].
The jury finding that defendant failed in his duty to diagnose and treat plaintiff's condition put the case in a posture where *204 plaintiff only had to show that there was a substantial possibility that decedent's death could have been avoided if proper psychiatric care had been rendered. Battista, 213 N.J. Super. at 151. Nowhere in the charge of the court is this principle conveyed to the jury. It is no wonder that the jury found no proximate cause, for as stated in Hake and reinforced by defendant's expert's testimony, it was not possible to demonstrate what would have happened if decedent had been seen and treated since the negligent defendant did not allow this circumstance to come to pass. 98 N.J. at 310. See also Evers, supra, 95 N.J. 399.
I would reverse and remand for a new trial.